360 So.2d 587 (1978)
Succession of John Jacob ZINSEL.
No. 9197.
Court of Appeal of Louisiana, Fourth Circuit.
June 13, 1978.
Rehearing Denied July 26, 1978.
*589 Henry L. Klein, New Orleans, for plaintiff-appellant, Josephine Andracchio.
D. A. McGovern, III, New Orleans, for plaintiffs-appellants, Joseph G. Zinsel, Individually and as Testamentary Executor, and Mrs. Dolores Clark Zinsel.
Before LEMMON, GULOTTA and BOUTALL, JJ.
GULOTTA, Judge.
In this contest, the trial court upheld the validity of a will bequeathing decedent's estate to his wife and brother but further concluded that the decedent's only son was a putative child and entitled as such to the legitime. We affirm.
In 1939, John Jacob Zinsel, Jr. married Dolores Clark (Lola) and remained married to her until his death. No children were born of that marriage. In the late 1950's, however, Zinsel met Josephine Andraccio (Linda) and the two underwent a marriage ceremony in Cuernavaca, Mexico in August, 1959. The couple returned to New Orleans following this ceremony and lived as man and wife. In April, 1961, a son, John Jacob Zinsel, III, was born to them. In 1964, however, Linda, according to her testimony, first learned that Zinsel had never divorced Lola. Though Linda and Zinsel did not thereafter live as man and wife, Zinsel recognized John, III as his son, and supported and enjoyed a warn relationship with him.
The statutory will under attack was executed on July 25, 1975, while the decedent, John J. Zinsel, Jr. was hospitalized during his last illness. Named as legatees were the testator's legal wife and brother. The will, by its terms, revoked a prior will executed by Zinsel on December 4, 1973, which had named his son as residuary legatee.
Zinsel died on August 7, 1975, and both wills were offered for probate. On behalf of her minor son, John Zinsel, III, Linda petitioner to annul the probate of the July 25, 1975 will on the grounds that the decedent was incompetent at the time the will was signed and that the testament was defective as to form. By amended and supplemental petition, she further alleged that a putative marriage had existed between her and the decedent and that the later will, if valid, should be modified so as not to deprive John, III of his forced portion as a putative child.
After trial,[1] judgment was rendered dismissing the petition to annul the July 25, 1975 will, but further recognizing John, III as a putative child and entitled as such to the legitime, one third of decedent's estate.
On appeal, Linda contends that the testator at the time of the execution of this will was suffering from terminal cancer and was under the influence of a pain-relieving drug which deprived him of testamentary capacity. She further argues that the decedent, due to his infirmity, lacked the muscular control to sign the will; that his purported signatures on the document are at best "marks"; and that the will is therefore null because it fails to mention the physical cause hindering the decedent from signing as required by LSA-R.S. 9:2442.[2]
*590 The decedent's brother and legal wife, on the other hand, contend the trial judge erred in recognizing John, III as a putative child. According to the legatees, the mother of the child was not in good faith when she entered into the purported marriage with Zinsel because she knew or should have known of his existing marriage and failed to investigate his marital status prior to the ceremony.

VALIDITY OF THE WILL
It is well settled that testamentary capacity is presumed and a person attacking the will has the burden of proving lack of capacity at the time the will was executed. McCarty v. Trichel, 217 La. 444, 46 So.2d 621 (1950); Succession of Chopin, 214 So.2d 248 (La.App. 4th Cir. 1968). Similarly, proof of non-observance of formalities in the execution of a will must be exceptionally compelling to rebut the presumption of validity. Succession of Staggers, 254 So.2d 289 (La.App. 4th Cir. 1971), writ refused, 260 La. 11, 254 So.2d 617 (1971). Furthermore, testamentary capacity and the observance of formalities are factual questions and the findings of the trial judge are not to be disturbed unless manifestly erroneous. Succession of Brown, 251 So.2d 465 (La.App. 1st Cir. 1971); Succession of Staggers, supra.
In his written report, the commissioner concluded the opponents of the will had failed to "bear" the burden of showing "lack of testamentary capacity and form". The record supports these conclusions.
The notary and two witnesses, present at the signing of the will, testified the decedent had appeared completely lucid and competent. The notary stated that the will had been read aloud paragraph by paragraph; that the testator had answered affirmatively after each paragraph; and that the testator understood what was being read. This testimony was corroborated by decedent's brother who stated that on the day prior to the signing of the will decedent had expressed his displeasure with the earlier will and had indicated his desire to change it.
The decedent's treating physician saw the testator approximately 25 or 30 minutes before the signing of the will on July 25[3] and stated Zinsel was sitting up in bed and was wide awake though he was in pain and irritated. According to this physician, Zinsel at that time was in full possession of his mental faculties.
The doctor stated further that when he saw Zinsel on the day the will was made, Zinsel was talking on the phone to his attorney. (This is not the notary who prepared the 1975 will, but the attorney who prepared testator's earlier 1973 will.) According to the doctor, two days before the day the will was signed, Zinsel had seemed weak but "lucid". On hospital visits, Zinsel conversed with the doctor after July 25 until Zinsel died on August 6. The doctor indicated Zinsel had conversed less each day, but that he had understood the doctor's inquiries and responded to questions.
Though an injection of Dilaudid, a painrelieving drug, was administered pursuant to the physician's order at 10:55 a. m., the doctor testified that it would have taken at least 15 minutes or longer for any appreciable effect to result. The doctor further stated that the drug does not induce sleep but because of the drug's painkilling effect, sleep is permitted. The physician indicated Zinsel would not lose his mental capacity after the injection and in the event he did fall asleep he could be awakened and would be mentally competent to talk, discuss and understand.
It is true, as pointed out by opponents of the will, that a medical expert, after reviewing the hospital records, stated "the man was most probably not mentally competent to engage in detailed thinking". It is true also that this expert doubted seriously that the testator would have been capable of understanding. We are aware also that the 15-year-old son of the decedent testified that on the day before the will was *591 signed, his father had expressed a desire not to "go through with the will". This witness further stated that three days before the signing of the 1975 will his father (testator) was in poor condition. We recognize further that decedent's attorney (not the attorney who prepared the will) stated he had seen Zinsel at the hospital on the day following the signing of the will and he was unable to "communicate" with the decedent.
The trial judge, however, after hearing the evidence concluded, based on credibility, the opponents had failed to establish that the testator lacked testamentary capacity. We cannot say, under the circumstances, the judge erred.
With regard to the adequacy of decedent's signatures on the testament, the commissioner concluded:
"The decedent was given the will to sign and did so after assistance and raising his body to a level allowing him to sign. The signature or writing was made by the decedent and reveals a lack of muscular coordination which he previously had. * * *
"* * * In the instant matter, the writing of the decedent is more easily classified as a signature rather than a mark."
The record supports this conclusion.
Notwithstanding the testimony of an examiner of questioned documents who stated that the writing on the July 25 will is illegible and cannot be compared to Zinsel's standard signature, the notary testified that Zinsel had "laboriously" signed his name to the testament without assistance to his hand or arm although some "juxtapositioning" had taken place in order to get him into a comfortable position so that he could write. He further stated that Zinsel had apologized for the quality of his signature and had stated that it was the best he could do in his condition. This testimony was substantially corroborated by the two witnesses to the testament. Copies of the will introduced into evidence are signed in a manner indicative of Zinsel's signature rather than an abstract marking.
In Succession of Broussard, 210 So.2d 589 (La.App. 4th Cir. 1968), interpreting LSA-R.S. 9:2442 pertaining to the testator's inability to sign his name because of a physical infirmity, this court stated:
"* * * [T]he words thereof [LSA-R.S. 9:2442(A)(1)] convey the conviction that it was drawn to apply in situations in which the testator's physical infirmity was of such a degree as to render him unable to sign his name in any fashion, so that he could only make his `mark' on each page of the instrument and at the end thereof. Thus, where the testator maintains his ability to sign, and his signature is merely unsteady, the amendment has no application. * * *" (emphasis supplied)
The evidence considered, we find no error in the commissioner's finding that "the writing of the decedent is more easily classified as a signature rather than a mark" and that the will is not defective in form. Under the circumstances, we conclude, as did the trial judge, the July 25, 1975 Zinsel will is valid.

PUTATIVE CHILD
LSA-C.C. art. 117 provides:
Art. 117. Civil effects of putative marriage
"Art. 117. The marriage, which has been declared null, produces nevertheless its civil effects as it relates to the parties and their children, if it has been contracted in good faith."
LSA-C.C. art. 118 provides:
Art. 118. Persons entitled to civil effects of putative marriage
"Art. 118. If only one of the parties acted in good faith, the marriage produces its civil effects only in his or her favor, and in favor of the children born of the marriage."
It is undisputed that John Zinsel, Jr. acted in bad faith in entering into a second marriage without terminating his first. At issue is Linda's good faith in marrying Zinsel. If she acted in good faith, a putative *592 marriage existed between her and Zinsel until 1964 and John Zinsel, III, born of that marriage in 1961, is a putative child, entitled as such to share in his father's estate. LSA-C.C. art. 118; Succession of Verrett, 224 La. 461, 70 So.2d 89 (1953); Succession of Jene, 173 So.2d 857 (La.App. 4th Cir. 1965).
"Good faith" within the meaning of LSA-C.C. arts. 117 and 118 has been defined as "an honest and reasonable belief that the marriage is valid and that no legal impediment exists thereto". Succession of Fields, 222 La. 310, 62 So.2d 495 (1952); Succession of Pigg, 228 La. 799, 84 So.2d 196 (1955). The existence of good faith is a factual question dependent upon the circumstances of each case. Succession of Chavis, 211 La. 313, 29 So.2d 860 (1947). Furthermore, this good faith is presumed to exist in favor of a party claiming to be a putative spouse who, free of her own impediment, enters into the marriage and the burden of proving the lack of good faith is upon the party attacking the marriage. Succession of Chavis, supra; Succession of Jene, supra.
Though no marriage certificate or other instrument was produced to document the ceremony, Linda testified that a marriage ceremony had taken place in Mexico on August 19, 1959. According to Linda, a justice of the peace and a witness officiated at the English-speaking ceremony. Her testimony was corroborated by her 15-year-old daughter (from a prior marriage) who was present at the ceremony. Further support that a marriage ceremony in fact took place is a document in evidence dated June 28, 1968, signed by Zinsel in which he agreed to pay support to John, III until his 18th birthday. This agreement contained the following clause:
"whereas, the parties hereto had entered into a purported contract of marriage, the legality of which has been ascertained to be null and void . . ."
As pointed out by the commissioner, such wording establishes a "contract of marriage" was entered into between Linda and Zinsel.
Linda testified that on first meeting, Zinsel used an alias. Shortly thereafter, upon confronting him with her knowledge of his use of the alias, Zinsel explained that he wanted to be desired for his personal qualities and not for his wealth. According to her testimony, at that time he told her that he had previously been married but was divorced. At Zinsel's suggestion, Linda obtained a divorce on March 6, 1957 from her previous spouse. Acquaintances of Zinsel and Linda testified a wedding celebration took place at the couple's apartment. They apparently lived together as man and wife and shared the usual family life after the birth of their child until sometime in 1964. Letters and photographs, in evidence, demonstrate Zinsel's affection for his son.
According to Linda, she did not meet or know of Zinsel's legal wife at any time prior to the wedding. She stated that it was not until early 1964 that she received a telegram and phone call and learned of the existence of the previous marriage. Though the couple did not thereafter live as man and wife, Zinsel remained in close contact with his son and continued to support him. Linda stated that she had not investigated Zinsel's marital status prior to the Mexican ceremony because she had believed his statement that he had obtained a divorce and had no reason to require further proof.
Though Zinsel's legal wife stated that she had personally confronted Linda in 1957 and again in June, 1959, and had informed her of the existence of the legal marriage, and though an adult daughter of the wife (Lola) from an earlier marriage testified she had told Linda that Zinsel was still married to Lola, the trial judge chose not to accept this testimony.
Again, we are faced with a credibility determination made by the trial judge supported by evidence in the record. The trial judge simply believed Linda was in good faith when the ceremony took place and continued in good faith at the time of and after the child's birth in 1961.
*593 We find no merit to the legatees' reliance on language in Succession of Taylor, 39 La.Ann. 823, 2 So. 581 (1887); Prieto v. Succession of Prieto, 165 La. 710, 115 So. 911 (1928) and Succession of Hopkins, 114 So.2d 742 (La.App. 1st Cir. 1959) to the effect that the mere declaration by a husband that he has been divorced is insufficient to create a presumption of good faith on the part of a woman who marries him without further inquiry. In the cited cases, there exist factual circumstances significantly different from those in our case. In Taylor, the party claiming to be a putative spouse knew the wife and children of the previous marriage and was aware that a court had denied the wife a divorce. In Prieto, the party claiming putative status did not obtain a divorce. The Hopkins court concluded that decedent's known relationship with other women, and knowledge by the party claiming putative status of the existence of a wife and child, were such that she should have investigated decedent's marital status. Her failure to investigate, the court concluded, was fatal to her claim as a putative wife.
In the instant case, the trial judge apparently concluded, based on a credibility determination, that Linda was not under any obligation to investigate further Zinsel's marital status after having been told by him that he had been divorced. We find no error. Indeed, upon first learning in 1964 of the possibility that Zinsel had not been divorced, she immediately demanded documentary proof from Zinsel and sought legal counsel to ascertain Zinsel's marital status. Under the circumstances, we find no error in the trial court's conclusion that John Zinsel, III is a putative child of John J. Zinsel, the decedent, and is entitled as such to a forced portion and/or legitime amounting to one third of decedent's estate.
Accordingly, we affirm the trial court's judgment. The matter is now remanded to the trial court for further proceedings consistent with the views expressed herein.
AFFIRMED AND REMANDED.
NOTES
[1] The matter was tried before a commissioner who rendered a written report. Judgment was rendered in accordance with his findings.
[2] LSA-R.S. 9:2442(A)(1) provides:

§ 2442. Statutory will; form
"A. Except as provided in Subsection B, the statutory will shall be in writing (whether typewritten, printed, mimeographed, or written in any other manner), and shall be executed in the presence of a notary and two competent witnesses not otherwise disqualified under Articles 1591 and 1592 of the Civil Code, shall be dated, and shall be made in the following manner:
(1) In the presence of the notary and both witnesses the testator shall signify to them that the instrument is his will and shall sign his name at the end of the will and on each other separate sheet of the instrument. If the testator is not able to sign his name because of some physical infirmity, he must so declare or signify to the notary in the presence of the witnesses as well as declare and signify the cause that hinders him from signing, and shall then affix his mark in the places where his signature is required. Express mention of the testator's declaration or signification and of the cause that hinders him from signing his name must be made in the act."
[3] The treating physician testified he saw the testator at 10:55 a. m. The notary stated the will was signed at approximately 11:10 or 11:15 a. m. on that same morning.