377 So.2d 516 (1979)
SUCCESSION OF Oliver Gordon COLLINS, Jr., Sue Collins Peyton and Anne Collins Jackson, Plaintiffs and Appellants,
v.
Louney Suire HEBERT, Jules Hebert and David Craig Brignac, Defendants and Appellees.
No. 7186.
Court of Appeal of Louisiana, Third Circuit.
November 12, 1979.
Writ Refused January 18, 1980.
Domengeaux & Wright, Bob F. Wright, Lafayette, for plaintiffs and appellants.
Cook, Clark, Egan, Yancy & King, Sidney E. Cook, Shreveport, Davidson, Meaux, Sonnier & Roy, L. Lane Roy, Lafayette, Fusilier, Pucheu, Soileau & Coreil, L. O. Fusilier, Ville Platte, for defendants and appellees.
Before WATSON, CUTRER, and DOUCET, JJ.
DOUCET, Judge.
Oliver Gordon Collins, Jr. died in Lafayette, Louisiana on June 10, 1974. He left a last will and testament in statutory form dated October 11, 1973. His succession was opened, and the will was probated on June 12, 1974. Among the legatees named in it were defendants, Louney Suire Hebert, Jules Hebert and David Craig Brignac. On July 23, 1974, Collins' aunts, Mrs. Sue Collins Peyton and Mrs. Anne Collins Jackson, brought this suit to annul the probated will on the grounds that Collins was not of sound mind at the time the will was executed. From a judgment declaring the will to be valid and dismissing their suit, they appeal.
The only issue on appeal is whether the trial court erred in finding that Collins had the requisite testamentary capacity at the time the will was confected.
The following facts revealed by our examination of the record do not appear to be seriously disputed. Oliver Gordon Collins, Jr. was an only child born to a wealthy *517 family. Apparently somewhat gifted intellectually, he graduated from law school and served as a pilot in the U. S. Navy. He eventually settled in Lafayette, where he became a successful land man and lease broker in the oil industry. At some point in his adult life, Collins began to habitually drink to excess. Exactly when this pattern of excess drinking began is not clear from the record, however, many of the people closely associated with him noticed a marked increase in his drinking following several traumatic experiences in the 1960's.
He was engaged to be married, and his fiancee broke the engagement shortly before the marriage was to have taken place. In addition, both of his parents died within about a year's time. By the end of the 1960's or early 1970's it became apparent that Collins was suffering from the chronic, debilitative disease of alcoholism. His close friends and family tried unsuccessfully to get him to stop drinking. He was hospitalized numerous times for the treatment of his alcoholism but always resumed drinking shortly after being released.
Collins resented the efforts of those trying to help him, and many of his close relationships became strained. He began to associate with people much younger than he. Apparently in an effort to win their approval, and friendship, he gave away a number of automobiles and other expensive gifts. His interest in his business activities declined, and he eventually moved to a camp he owned in Caddo Parish, giving his longtime secretary power of attorney to handle most of his affairs.
By the time of his untimely death at the age of forty-three (43), Collins had suffered extensive physical deterioration as a result of his excessive alcoholic intake and associated poor nutritional habits. His autopsy revealed that many of his vital organs had become impaired. Among the organs adversely affected was his brain. Microscopic studies showed that a significant percentage of his brain cells had been damaged or destroyed.
Plaintiffs contend that because of these untoward physical effects of Collins' alcoholism, he did not have the mental capacity necessary to execute a valid will on October 11, 1973. In support of that argument, they presented the testimony of a number of people who witnessed the increase in Collins' drinking as well as the changes in his social behavior and declining interest in business matters described above. However, most of those witnesses had little if any contact with Collins after he moved to his camp in Caddo Parish two years or so before his death.
Y. B. Bickens, a sixty-eight (68) year old domestic employed by the Collins family for many years, testified that he was with Collins at the camp in Caddo Parish during those last years. According to Bickens, Collins was intoxicated almost constantly during that time, and it became necessary for Bickens to do almost everything for him, including putting him to bed several times a day, attending to his personal grooming, and feeding him. He testified that he was with Collins at all times while he was at the camp, because he had become reduced to a state of almost total helplessness.
James Peltier, a Lafayette attorney, testified that he and Collins were close friends. He observed Collins in an intoxicated state on many occasions, and felt that he had become increasingly irresponsible financially. He tried unsuccessfully to dissuade him from giving away expensive automobiles. He also refused to prepare a will and an act of donation for Collins about a year before his death. His refusal was based in part on the fact that Collins was intoxicated when he requested that the documents be prepared, however, he also indicated that he felt that Collins was generally incompetent by that time.
Defendants' witnesses presented a substantially different picture of Collins' behavior during the last two years of his life. All of the witnesses who saw him regularly during that time agreed that he drank heavily. However, according to their testimony, he was not intoxicated at all times, and even when intoxicated was far from being helpless. They described him as a highly intelligent, strong-willed individual, who had full control of his faculties.
*518 Mrs. Dale Nix, Sr., Dale Nix, Jr., and Donald Bruce were friends of Collins and his neighbors when he lived in Caddo Parish. They all testified that they saw Collins frequently, and that while he was often intoxicated in the evenings, he was usually sober in the mornings. They challenged Y. B. Bickens' statement that he was with Collins at all times. According to them, Bickens was frequently absent when they visited Collins, particularly on weekends. Collins did not appear to them to be unable to fend for himself at those times. Dale Nix, Jr. and Donald Bruce had been passengers in Collins' car on different occasions. They testified that he drove safely and without any apparent difficulty.
That impression of Collins was shared by the Notary and witnesses before whom the will was executed. Mr. Edwin McGlasson, a Lafayette attorney, prepared the will and served as notary. The witnesses were John Hutchinson, one of Mr. McGlasson's law partners, and Irene Schoofs, an experienced legal secretary and notary. They testified that Collins was fully alert and seemed to be totally aware of what he was doing. They observed no odor of alcohol, slurring of speech or unsteadiness of gait.
In addition to the testimony of the lay witnesses for both sides, a substantial amount of medical evidence was introduced. Plaintiffs rely heavily upon the testimony of Dr. Paul McGarry, a board certified neuropathologist, who had examined Collins' brain and prepared numerous microscopic slides of the brain tissue. Based on the pathological changes that he observed, including the number of damaged or destroyed brain cells, he rendered the opinion that Collins could not have fully understood the nature of his act, when the will was confected in October of 1973. His opinion was based strictly on his post mortem studies of Collins' brain since he had never had occasion to examine or observe Collins while he was alive.
Dr. McGarry's opinion was challenged by other physicians who testified at the trial. Dr. Joseph T. Brierre, a highly qualified pathologist, and Dr. Robert Martinez, an equally qualified neurologist, testified that they knew of no medical authority supporting the theory that accurate conclusions about a person's behavior or mental ability while alive could be drawn from post mortem studies of the brain. Dr. Brierre stated that he had done a computer research check of the medical literature in the National Medical Library in Bethesda, Maryland and had uncovered nothing to support such a theory. In addition, he had contacted other physicians, including Dr. Kenneth Earle, a past president of the International Society of Neuropathology and a member of the board that examines physicians seeking certification in neuropathology. Dr. Earle was unaware of anyone who claimed to be able to draw the kind of conclusions that Dr. McGarry did.
Dr. Brierre's skepticism was based not only on this lack of authoritative support. He gave specific examples of cases in which there was a definite lack of correlation between the pathological changes revealed by post mortem studies of the brain and the decedent's ability to function prior to death. Two of the examples given were Senator Clifford Case and Senator Estes Kefauver. He stated that examinations of the brains of both of these men had revealed pathological changes of the type found in Collins' brain, yet they had functioned well and had had normal intellectual capabilities prior to their deaths.
Plaintiffs argue that the conflict between the opinions of these physicians must be resolved by according greater weight to the opinion of Dr. McGarry because he is a board certified subspecialist, while the others are merely specialists. In support of that argument, they cite this court's opinion in Mann v. Broussard, 200 So.2d 768 (La. App. 3rd Cir. 1967), wherein it was held that in assessing the amount of damages to be awarded to the plaintiff, the opinion of an orthopedic surgeon concerning the nature, extent and duration of his injury was entitled to greater weight than the conflicting opinion of a general surgeon.
We note that in the instant case the conflict between the medical opinions is of a *519 slightly different nature. Dr. McGarry was the only physician who gave an opinion as to whether or not Collins was competent when the will was executed, therefore, there are no conflicting opinions on that point. The dispute here is over the question of whether or not it is medically possible to determine from post mortem examinations of a brain the mental capacity of an individual eight months prior to his death.
In any event, Dr. McGarry's testimony must be weighed not only against the testimony of the other physicians but also against the equally relevant testimony of the many witnesses who had observed Collins' behavior prior to his death. Dr. McGarry's conjectures about Collins' behavior differed sharply from the observations of many of those witnesses.
According to Dr. McGarry, the damage to Collins' brain would have prevented him from successfully performing complex motor functions, such as driving a car in heavy traffic, and would have caused him to have memory losses as well as other problems. Several witnesses, including Dale Nix, Jr. and Donald Bruce, testified that Collins was able to drive his car, even in heavy traffic. Other witnesses testified that they had done business with Collins. James Moncrieff, a geologist and oil operator, Billy Bolton, Collins' C.P.A., and Don Hooter, his banker, all testified that Collins was able to remember the details of his business transactions and always knew what he was doing.
Ann Percell, Collins' cousin, and Mrs. Inez Yearwood, a family friend who had known Collins since his youth, both testified that Collins had discussed the provisions of his will with them, after it had been executed. Mrs. Yearwood had encouraged him to include his aunts in the will, but he stated that he had disinherited his aunts and was proud of it.
It is well settled that testamentary capacity is always presumed, unless the contrary is proven. Succession of Zinsel, 360 So.2d 587 (La.App. 4th Cir. 1978), writ denied 363 So.2d 72 (La.1978); Succession of Patterson, 329 So.2d 925 (La.App. 2nd Cir. 1976), writ denied 334 So.2d 231 (La.1976); Succession of Bush, 292 So.2d 915 (La.App. 1st Cir. 1974), writ denied 294 So.2d 837 (La.1974); Guidry v. Hardy, 254 So.2d 675 (La.App. 3rd Cir. 1971), writ denied 260 La. 454, 256 So.2d 441 (1972).
The party alleging lack of testamentary capacity at the time the will was executed bears the burden of proof. Succession of Zinsel, supra; Succession of Gumbel, 333 So.2d 340 (La.App. 4th Cir. 1976), writ denied 338 So.2d 111 (La.1976); Succession of Bush, supra. The degree of proof required to overcome the presumption of testamentary capacity is similar to that required to rebut the presumption of innocence which the law creates in favor of the accused in criminal cases. Succession of Patterson, supra; Guidry v. Hardy, supra; Succession of Bush, supra.
After receiving all of the evidence, the trial court concluded that plaintiffs had not borne their burden of proving that Collins was not of sound mind. Whether or not a testator had the requisite capacity is a question of fact, and the findings of the trial judge will not be disturbed on appeal unless they are manifestly erroneous. Succession of Zinsel, supra; Succession of Staggers, 254 So.2d 289 (La.App. 4th Cir. 1971); Succession of Brown, 251 So.2d 465 (La.App. 1st Cir. 1971). We find no error in the trial court's conclusion.
For the above and foregoing reasons, the judgment appealed is affirmed. All costs of this appeal are assessed against the plaintiffs.
AFFIRMED.
WATSON, J., concurs in the result and assigns reasons.
WATSON, Judge, concurring:
The Civil Code requires that a person making a donation mortis causa be "of sound mind." LSA-C.C. art. 1475. It is indeed difficult for me to conclude that Gordon Collins, the deceased; who sometimes consumed 80 bottles of liquor per month; who was drunk every morning (and *520 many evenings); who spent week upon week in hospitals for alcoholics; whose close attorney friend refused to write him a new will; who gave new Buicks to young friends for no apparent reason; and who was found by autopsy to have destroyed 50 to 90 per cent of his brain cells by drinking; was of sound mind.
However, the jurisprudence has placed an almost impossible burden on those who attack a will on the basis asserted in this case.
In addition, the trial judge's opportunity to see and hear the witnesses must be respected. While I believe that my learned colleague of the trial court may have erred, I cannot say that it is clear that he did so. This case is one of those where the evidence is susceptible of sustaining more than one reasonable conclusion.
I do not agree with the jurisprudential amplification of Article 1475, but I am bound by it. I do not agree with the trial court's conclusion as to the weight of the evidence, but I cannot demonstrate manifest error. Therefore, I respectfully concur in the result.