CUTRER, Judge.
This appeal presents the issue of whether Eddie Deshotels, deceased, possessed the mental capacity to confect a last will and testament.
Eddie Deshotels died June 22, 1981, in Calcasieu Parish. His wife, Edna, predeceased him, having died on January 10, 1981. During the 1950’s Eddie and his wife had confected reciprocal wills wherein they, each willed their property to the other. As a result of the death of his wife, Eddie’s prior will became ineffective since he had willed his property to her. If he had not made another will, all the property would be inherited by his collateral heirs since Eddie and Edna had no surviving descendants or ascendants. Eddie confected a new will dated January 13,1981, before a notary and three witnesses. This will bequeathed one-half of the property to the heirs of Eddie and one-half to the heirs of Edna.
This will was submitted for probate and Connie LeMaire was appointed executrix of the successions. Opposition to the probate was filed by a number of heirs of Eddie Deshotels. Made defendants were the executrix and the heirs of Edna Deshotels. The plaintiffs’ contention was that Eddie was not mentally competent to confect a will on January 13,1981. After trial on the merits, the trial court rendered judgment dismissing plaintiffs’ suit at their cost. Plaintiffs appeal. We affirm.
The general principles applicable to the issue of mental competency of a testator are set forth in the case of Succession of Collins v. Hebert, 377 So.2d 516, 519 (La. App. 3rd Cir.1979), writ den., 379 So.2d 15 (La.1980), as follows:
“It is well settled that testamentary capacity is always presumed, unless the contrary is proven. Succession of Zinsel, 360 So.2d 587 (La.App. 4th Cir.1978), writ denied 363 So.2d 72 (La.1978); Succession of Patterson, 329 So.2d 925 (La.App. 2nd Cir.1976), writ denied 334 So.2d 231 (La.1976); Succession of Bush, 292 So.2d 915 (La.App. 1st Cir.1974), writ denied 294 So.2d 837 (La.1974); Guidry v. Hardy, 254 So.2d 675 (La.App. 3rd Cir.1971), writ denied 260 La. 454, 256 So.2d 441 (1972).

“The party alleging lack of testamentary capacity at the time the will was executed bears the burden of proof. Succession of Zinsel, supra; Succession of Gumbel, 333 So.2d 340 (La.App. 4th Cir.1976), writ denied 338 So.2d 111 (La.1976); Succession of Bush, supra. The degree of proof required to overcome the presumption of testamentary capacity is similar to that required to rebut the presumption of innocence which the law creates in favor of the accused in criminal cases. Succession of Patterson, supra; Guidry v. Hardy, supra; Succession of Bush, supra.”

With these principles in mind we examine the testimony in order to determine whether the trial judge was clearly wrong in his factual conclusions.
At the time of his death, Deshotels was adversely affected by medical problems that are not unusual for elderly people. The record does not disclose his age but the trial judge concluded that he was in his late eighties.
Dr. David Buttross had been treating Deshotels since the early 1970’s for a heart condition and for a neurological problem that affected his ability to walk. On November 21, 1980, Dr. Buttross admitted him to the hospital in Lake Charles after he complained of headaches, a slurring of speech and nausea. Dr. Buttross stated that Deshotels was confused when he was hospitalized due to his having suffered a stroke. Dr. Buttross testified that Desho-tels began to improve while hospitalized and was discharged on December 9, 1980. This was the last time Dr. Buttross saw Deshotels until a few days before his death on June 22, 1981.
Amos Deshotels, a brother of the deceased, and a party-plaintiff, testified that he spent two weeks in Lake Charles in November and December 1980. Amos was a resident of New Jersey. He visited Desh-otels in the hospital several times. He tes *723 tified that Deshotels did not recognize him and was unable to hold any conversation. The only thing that Eddie would talk about was those events that happened in the distant past. Amos returned to New Jersey after his two week visit. He returned to Lake Charles on January 24,1981, and upon visiting deceased, he stated that he found the same condition he had seen in December 1980.
Harry Deshotels of Jennings, Louisiana, an uncle of deceased and a party-plaintiff, stated that he saw deceased in the hospital on one occasion and again at home on January 17, 1981. He stated that Eddie was unable to hold any conversation and that Eddie did not recognize him. The testimony of plaintiffs’ other witnesses was substantially the same as that given by Harry Deshotels; i.e., they visited the deceased on two or three occasions, both in the hospital and at home, and found that deceased did not recognize them and was not able to hold a conversation.
Testifying on behalf of the defendants was a nurse, Rose Dougay, who attended to Deshotels for the last seven months of his life; Paul Palmer, the attorney who prepared the will; his secretary; Harold Mires, a certified public accountant who had prepared Deshotel’s income tax for several years and who witnessed the confection of the will, and Connie LeMaire, who had attended to Deshotel’s business for several months prior to his death.
Rose Dougay was employed to care for Deshotels beginning in November 1980 until his death in June 1981. She worked from 5:30 A.M. until 5:30 P.M. six days per week. She stated that after his initial stroke, his speech was slurred but that he understood what was going on. He would converse with her. He would respond to questions. She stated, for instance, that each day he told her what he wanted to eat each meal. She listened to the conversation between him and Paul Palmer on the day that the will was confected. She heard the attorney explain the effect of the death of Deshotel’s wife insofar as the inheritance of his property. She heard Deshotels say emphatically that he did not want his heirs to inherit all his property but that he wanted to divide the property between his heirs and those of his deceased wife. This witness stated that Deshotels experienced some days when he was not as responsive as he was on others, but he was responsive and rational a majority of the time.
Harold Mires, a certified public accountant, testified that Deshotels was on the board of directors of the Vinton Co-op Dryer. He had prepared Deshotels’ tax return each year since 1953. Mires spoke French which was the native tongue of Deshotels. Deshotels could speak English but preferred the French language whenever possible. He accompanied Paul Palmer to the home of Deshotels. They first went there to find out how Deshotels wanted to dispose of his property in his will. This witness testified as follows:
“Q. And the first visit was for what purpose?

“A. The first visit was to gather the information as to what he wanted in his will.

“Q. And on that first visit, do you recall him speaking to you about what he wanted?

“A. Yes.

“Q. And what did he tell you that he wanted?

“A. As I recall, he wanted his wife’s family to share in one-half of what he died possessed of....

“Q. So, on the first visit on January the ISth, you held a discussion with him concerning his desires and his wishes with respect to his estate.

“A. That’s correct.”

After the will had been prepared Mires accompanied Paul Palmer to the home of deceased for the confection of the will. His testimony in this regard reads as follows:

“Q. Were you present when the will . was read aloud?

“A. Yes.

“Q. And were you handed a copy of the will?

*724
“A. Right.

“Q. And you read along with .. .

“A. Along with Mr. Palmer, and after it was read, I asked him if he fully understood it.

“Q. You asked him?

“A. I asked him that. Mr. Palmer asked him also.

“Q. And what was his response?

“A. And he said he did, and he said he wanted — that was what he wanted. Half of what was his was for his wife’s family. He was very definite about that.

“Q. Mr. Mires, do you stand to receive anything from this succession? Are you named as an heir or legatee, to your knowledge?

“A. No, I am not.”

Paul Palmer, an attorney practicing with the firm of Camp, Carmouche, Palmer, Barsh & Hunter, testified that on January 12, 1981, Connie LeMaire, a great niece of Deshotels, came to his office and informed him that Edna Deshotels had died and had left a will that had been prepared by Mr. John Camp, his partner. She wanted Palmer to handle the succession of Edna Desho-tels. Palmer was also told that Eddie Desh-otels was bedridden and would want to discuss the disposition of the property with him.
On the morning of January 13, 1981, Palmer visited the home of Eddie Deshotels along with Harold Mires. Connie LeMaire had found the prior reciprocal wills made by Eddie and Edna Deshotels. Palmer examined the wills and explained to Deshotels the consequences of the death of his wife. He stated that Deshotels made it clear to him that he wanted the property, upon his death, to be divided one-half to his heirs and one-half to his wife’s heirs. Palmer went back to his office and prepared the will, and at 1:30 P.M. he, along with his secretary and Mires, went back to Desho-tels’ home to execute the will. Palmer read the will to Deshotels and Deshotels confirmed that the will contained the dispositions that he desired. Palmer stated that, as a result of the conversations with Desho-tels, there was no question in his mind that Deshotels knew what he was doing and did what he wanted to do.
The testimony of the remaining witnesses corroborated the testimony of Mires, Rose Dougay and Palmer as to the mental competency of Deshotels to confect the will.
The trial court rendered written reasons for judgment which concluded as follows:

“The court is satisfied that Mr. Desho-tels clearly understood, on the date of this will, what would happen with his property, including that portion coming to him as a result of the death of his wife, at the time of his death if he did not make a new will, and that he emphatically expressed his intention that it not be inherited entirely by his ‘side’ of the family. On at least two (2) occasions on January 13,1981, he made it clear that he intended that one-half (V2) of it go to his wife’s ‘side’ of the family.

“It may well be true that on some days Mr. Deshotels either could not or would not communicate with visitors, but whether this was due to inability or simply despression because of his state one may only speculate. The court is not permitted to speculate; it may only rule upon clear and convincing evidence.

“The court determines, based upon all the testimony and evidence, the credibility of the witnesses and the applicable law, that the presumption of sanity has not been overcome in this case. Decedent may possibly, at the most, have been classified as furious but certainly the proof is insufficient to classify him as mente cap-tas. He was sane at the time of planning and executing his will of January 13, 1981; he understood the nature of his act and its consequences, specifically who was to inherit his properties. It will be ordered that the demands of plaintiffs to annul the testament be rejected at their cost.”
The record fully supports the factual findings of the trial judge. The findings of the trial judge will not be disturbed on appeal unless they are manifestly erroneous. We find no such error by the trial *725 court. The trial court judgment will be affirmed.
For these reasons the judgment of the trial court is affirmed. Plaintiffs-appellants are to pay the costs of this appeal.
AFFIRMED.