505 So.2d 808 (1987)
Doris D. REBOUCHE, Plaintiff/Appellant,
v.
Andy ANDERSON, Bob Kightlinger, B & B Medical, Inc. and Scimed Life Systems, Inc., Defendants/Appellees.
No. 18493-CA.
Court of Appeal of Louisiana, Second Circuit.
April 1, 1987.
Writ Denied June 5, 1987.
*810 Sam N. Gregorio, Shreveport, for plaintiff-appellant.
Cook, Yancey, King & Galloway by Sidney E. Cook, Shreveport, for defendants-appellees, Andy Anderson & Bob Kightlinger.
Bodenheimer, Jones, Klotz & Simmons by Frank H. Thaxton, III, Shreveport, for defendant-appellee, B & B Medical, Inc.
Lunn, Irion, Johnson, Salley & Carlisle by Ronald E. Raney, Shreveport, for defendant-appellee, SciMed Life Systems.
Before JASPER E. JONES, NORRIS and LINDSAY, JJ.
LINDSAY, Judge.
The plaintiff, Doris D. Rebouche, filed suit against Charles E. Anderson, Bob L. Kightlinger, B & B Medical, Inc. & SciMed Life Systems, Inc. for the wrongful death of her alleged husband, Joseph Y. Rebouche. Plaintiff claimed the decedent underwent open heart surgery on November 6, 1984 and that Anderson and Kightlinger, employed by B & B, were operating a heart-lung machine. Plaintiff claimed that the wrong valve was opened, causing the decedent to suffer an air embolism to the brain and brain damage. As a result, the decedent died on January 4, 1985.
B & B Medical filed an exception of no cause or right of action, claiming that Kightlinger and Anderson were not employed by the company and that the plaintiff was not the lawful widow of the decedent. Kightlinger and Anderson also filed an exception of no cause or right of action, asserting that plaintiff was not the lawful widow of the decedent.
A hearing on the exceptions was held and the plaintiff argued she was the putative spouse of the decedent. The trial court sustained the exceptions, finding that Kightlinger and Anderson were not employed by B & B and that plaintiff was not the lawful widow or the putative spouse of the decedent. The court also signed an order recognizing that plaintiff had no right of action against SciMed Life Systems, Inc. Plaintiff appealed the trial court judgment. For the following reasons, we affirm.

FACTS
The record indicates that the plaintiff has a sixth grade education and is below normal intelligence. Experts indicated at trial that plaintiff has a mental age of 12 years.
The plaintiff testified that in 1945, when she was 15 years old, she married Johnny Malcolm Wheeler. Two children were born of that marriage. Plaintiff testified the marriage with Wheeler deteriorated, she left Wheeler, and she and the children lived with her parents in Shreveport while plaintiff worked as a waitress in a local eatery. Plaintiff testified that a divorce was obtained from Wheeler, but that her mother took care of everything. Plaintiff's mother was awarded custody of plaintiff's two children.
Plaintiff then married Thomas J. Ramsey around 1955. The couple moved to Baton Rouge, and one child was born of the marriage, Thomas J. Ramsey, Jr. Plaintiff testified that Ramsey treated her cruelly and failed to provide the necessities of life. In 1959, plaintiff left Ramsey and returned to live with her parents in Shreveport. Plaintiff testified that at the time she left, she asked Ramsey if he would get a divorce and claimed he said that he would. However, Ramsey took no action to secure a divorce and in fact the parties did not divorce.
Plaintiff and her son testified that around 1963, Ramsey called Thomas J. Ramsey, Jr. and told him that he had remarried, and he invited the boy to return to Baton Rouge to live with Ramsey and his new wife. The record indicates that Ramsey did not in fact remarry until 1972.
Plaintiff claims she had no communication with Ramsey between the time she left Baton Rouge and her marriage to the decedent, Joseph Y. Rebouche in 1967. The record indicates that the couple and Thomas J. Ramsey, Jr. went to Oklahoma to look *811 at a coon dog and while there decided to get married.
Plaintiff claimed that because Ramsey told her he would obtain a divorce, because Ramsey indicated he had remarried, and because a long period of time had elapsed without communication with Ramsey, she assumed they were divorced and that she was free to marry Rebouche.

TRIAL COURT DECISION
The trial court found that plaintiff did not possess the requisite good faith in contracting the marriage with Rebouche that would entitle her to be recognized as Rebouche's putative spouse. The trial court found, based on the evidence presented, that plaintiff did not possess a reasonable belief that she was divorced from Ramsey at the time she purportedly married Rebouche. The trial court, in its opinion on the exceptions, stated that even though the plaintiff was lacking in education and intelligence, she had previously been through a divorce and was aware that a divorce from Ramsey was necessary.
The court found that even though plaintiff knew she needed a divorce from Ramsey, she took no action toward that end. The court found in light of plaintiff's testimony about her distrust of Ramsey, her reliance on his statement that he would obtain a divorce was not reasonable.
The court noted that plaintiff never investigated to see if Ramsey obtained the divorce before she married Rebouche, even though she knew Ramsey had family in Shreveport and that Ramsey continued to reside in Baton Rouge. Also, plaintiff had little difficulty contacting Ramsey when the present lawsuit arose. The trial court specifically found it unlikely that the content of Ramsey's phone call in 1963 was as described by Thomas Ramsey, Jr.
Finally, the trial court found that even though plaintiff claimed she had no contact with Ramsey since leaving him in 1959, the phone call in 1963 constituted some contact between plaintiff and Ramsey.
The plaintiff appealed the trial court decision which held that the plaintiff was not the putative spouse of Joseph Y. Rebouche and sustained the defendants' exceptions of no right of action. In seeking reversal of the trial court judgment, plaintiff relies upon five assignments of error. The first three assignments essentially argue that the trial court erred in failing to apply the correct law to the facts of this case. Plaintiff also argues the trial court erred in failing to allow certain questions to be asked of plaintiff's expert witness and that the trial court erred in refusing to admit the results of a polygraph examination administered to the plaintiff which she argues would show she had a good faith belief that she was free to marry Rebouche.

GOOD FAITH
The plaintiff argues that the trial court erred in failing to properly apply Louisiana law in determining whether she was entitled to putative spouse status. The plaintiff claims the trial court used an objective analysis rather than the subjective analysis required by Louisiana law. For the following reasons, we conclude that the trial court was not in error in denying the plaintiff putative spouse status.
LSA-C.C. Art. 117 provides:
The marriage which has been declared null, produces nevertheless its civil effects as it relates to the parties and their children, if it has been contracted in good faith.
LSA-C.C. Art. 118 provides:
If only one of the parties acted in good faith, the marriage produces its civil effects only in his or her favor and in favor of the children born of the marriage.
The good faith required for putative spouse status has been defined as an honest and reasonable belief that the marriage was valid and that no legal impediment to it existed. Funderburk v. Funderburk, 214 La. 717, 38 So.2d 502 (1949); Gathright v. Smith, 368 So.2d 679 (La.1978); Malek v. Yekani-Fard, 451 So.2d 669 (La.App. 1st Cir.1984); Hart v. Hart, 427 So.2d 1341 (La.App. 2d Cir.1983) writ denied 433 So.2d 152 (La.1983); Galbraith v. Galbraith, 396 So.2d 1364 (La.App. 2d Cir.1981) writs denied 401 So.2d 974, 975 (La.1981); Eddy v. *812 Eddy, 271 So.2d 333 (La.App. 2d Cir.1972) writ not considered 272 So.2d 695 (La.1973); Succession of Zinsel, 360 So.2d 587 (La. App. 4th Cir.1978) writ denied 363 So.2d 72 (La.1978).
Good faith consists of being ignorant of the cause which prevents the formation of the marriage, or being ignorant of the defects in the celebration which caused the nullity. Succession of Davis, 142 So.2d 481 (La.App. 2d Cir.1962).
The question of whether a party is in good faith is subjective and depends on all the circumstances presented in any given case. Galbraith v. Galbraith, supra; Hart v. Hart, supra. Although the good faith analysis incorporates the objective elements of reasonableness, the inquiry is essentially a subjective one. Hart v. Hart, supra.
If it is shown that a prior marriage has not been dissolved, the burden of proving good faith is on the party whose marriage is under attack. Greer v. Hatter, 364 So.2d 1050 (La.App. 2d Cir.1978) writ denied 367 So.2d 392 (La.1978); Gathright v. Smith, supra.
Determination of whether good faith is present is a factual question and the finding of the trial judge is entitled to great weight. That determination will not be overturned unless it is shown to be clearly wrong. Gathright v. Smith, supra; Malek v. Yekani-Fard, supra; Hart v. Hart, supra; Galbraith v. Galbraith, supra; Eddy v. Eddy, supra; Succession of Zinsel, supra; Succession of Barbier, 296 So.2d 390 (La.App. 4th Cir.1974). Any doubt as to the existence of good faith is to be resolved in favor of a finding of good faith. Eddy v. Eddy, supra.
There are several factors weighing in favor of plaintiff's claim that she honestly and reasonably believed she was divorced from Ramsey. Plaintiff offered extensive expert testimony to establish that she had an extremely low level of intelligence and has a mental age of approximately 12 years. Plaintiff has worked as a waitress most of her adult life and her tasks were limited to writing down orders and submitting them to the kitchen. She was not required to total the customer's checks. Plaintiff argued that due to her limited education and intelligence she was honest and reasonable in believing that she was divorced from Ramsey. Plaintiff also urged that Ramsey told her he would obtain a divorce and that when Ramsey called the couple's son in 1963 and told him he had remarried, the plaintiff assumed that Ramsey had obtained the divorce. Plaintiff also argued that because such a long period of time passed with no communication from Ramsey, she assumed they were divorced. Plaintiff admitted having undergone a divorce from her first husband, Johnny Wheeler, but argued that her mother took care of the details in those proceedings.
There are also numerous factors weighing against plaintiff's claim that she had an honest and reasonable belief that she was divorced from Ramsey. The plaintiff was 30 years old when she left Ramsey and was the mother of several children. Plaintiff had previously been divorced and in spite of her claim that her mother took care of the divorce proceedings, the record indicates that plaintiff accepted personal service of the divorce petition which was filed against her and signed the affidavit attached to her answer. Plaintiff testified that when she married, she knew that a marriage license was required and that she also knew that a divorce was necessary from Ramsey when she left him.
Plaintiff testified that due to Ramsey's actions, she did not trust him. In light of this fact, there was no reason for her to rely on Ramsey's statement that he would get a divorce. In fact, Ramsey's deposition, which was filed into evidence, brings into question whether Ramsey ever said he would obtain a divorce. Ramsey's deposition indicates that he did not recall any discussion concerning a divorce when he and the plaintiff separated.
Ramsey's deposition also calls into question the content of the telephone conversation between Ramsey and his son in 1963. Ramsey testified that he did not remarry *813 until 1972, and that he did so only after hearing that the plaintiff had obtained a divorce in Arkansas and had remarried.
Plaintiff never checked with Ramsey to be sure a divorce had been obtained before she married Rebouche. Plaintiff argued that the long passage of time with no communication between the parties led her to believe they were divorced. However, even though Ramsey and the plaintiff may not have directly communicated, the reason for the lack of communication was not because Ramsey's whereabouts were not known. Plaintiff knew that Ramsey was in the Baton Rouge area and that Ramsey had a brother-in-law who worked for the U.S. Postal Service in Shreveport. Ramsey testified that this brother-in-law delivered mail to the residence shared by the plaintiff and Rebouche. Ramsey's mother also resided in Shreveport. When the present lawsuit arose and the lack of a divorce from Ramsey became an issue, the plaintiff contacted Ramsey in Baton Rouge and appeared to have little difficulty in doing so.
Plaintiff made much of her lack of education and intelligence at trial; however, plaintiff was not illiterate. She worked much of her adult life as a waitress. Her neighbors and Ramsey testified that they did not notice any limited intellectual ability on the part of the plaintiff.
Given all these factors, it must be determined whether this plaintiff under these circumstances had an honest and reasonable belief that she was divorced from Ramsey. The trial court found that she did not and that finding is entitled to great weight and is not to be overturned unless shown to be clearly wrong. The decision in this case turns largely on the credibility determinations of the trial judge, and those determinations appear to be correct.
Even though this plaintiff had limited education and intelligence, she was acquainted with divorce proceedings and knew that it was necessary to obtain one from Ramsey. She did not personally take action to obtain a divorce. It is disputed whether Ramsey actually said he would obtain a divorce, but in light of plaintiff's distrust of Ramsey, she was unreasonable in relying on any indication he may have offered that he would obtain a divorce. The record also calls into question whether Ramsey relayed to plaintiff in 1963 that he had remarried. In his reasons for judgment, the trial judge indicated that this part of the conversation probably did not occur. In spite of plaintiff's low intelligence, she knew a divorce was necessary, she was distrustful of Ramsey, and she had the ability to contact Ramsey in Baton Rouge to determine whether she and Ramsey were in fact divorced before she married Rebouche. She failed to do this.
The plaintiff cites numerous cases in support of her contention that she was in good faith in marrying Rebouche. However, each of these cases is distinguishable from the present case. We will deal here only with the three cases cited by plaintiff which are factually similar to the present case.
In Eddy v. Eddy, supra, the wife was 16 years old when she first married. When the couple separated, the husband told the wife that he would get a divorce and later told her that he had actually obtained a divorce. She relied on this assertion and was in good faith in believing that she was free to remarry. In the present case, it is disputed whether Ramsey told plaintiff he would get a divorce and Ramsey never told plaintiff that he had actually done so.
In Succession of Primus, 131 So.2d 319 (La.App. 1st Cir.1961), the plaintiff, at age 13, married her first husband who was a drifter. When the couple separated, the husband told plaintiff that he would obtain a divorce. Many years later, after hearing that her first husband was dead, the plaintiff, an illiterate black female, married again. She was held to be in good faith and entitled to putative spouse status. In that case, the plaintiff knew nothing about the need for citation in order for a divorce to be obtained and she had no way of knowing the whereabouts of her first husband. These factors are distinguishable from the present case where the plaintiff was aware of the need for citation and knew how to get in touch with Ramsey.
*814 In Tillison v. Tillison, 129 So.2d 522 (La.App. 1st Cir.1961), the petitioner was an illiterate black female who married, later left her husband and, without obtaining a divorce, married her second husband. She was found to be entitled to putative spouse status because her first husband remarried before she did and because, prior to her second marriage, she received what she thought were divorce papers from Mississippi which she signed and returned.
In each of the cited cases, even though the plaintiffs had little education and/or married at an early age, there were additional factors upon which to base a good faith belief that a prior marriage had terminated in divorce which do not exist in the present case.
From our review of the record and the applicable law, we agree with the trial court that plaintiff did not have an honest and reasonable belief that there was no impediment to her marriage to Rebouche. We must affirm the trial court judgment finding that plaintiff did not have the requisite good faith to entitle her to putative spouse status.

EXPERT WITNESS
The plaintiff also claims the trial court erred in failing to allow four questions to be asked of plaintiff's clinical psychologist, Milton Rosenweig, concerning his opinion of how a person with the plaintiff's limited intellectual abilities would react to the factual situation presented in this case. The court sustained the defendant's objections to those questions because the opinion sought to be elicited from the expert went to the ultimate question to be decided by the court. The questions the plaintiff sought to ask the expert witness are as follows:
Q. [by plaintiff's counsel]: Let me ask you this: I want you to assume for a second that Ms. Rebouche's former husband told her when she left him that he would get a divorce. Is Ms. Rebouche the type of person who would believe him and rely on him to get that divorce? ...
Q. [by plaintiff's counsel]: I'm going to ask you a different question now. Assume that Doris Rebouche was told that her former husband had remarried. Is Doris Rebouche the type of person who would have believed that statement and acted on it without any further checking?
...
Q. [by plaintiff's counsel]: My next question is, ifassume that Doris Rebouche did not have any contact with her former husband for a period of about seven years. Is she the type of person who would take it for granted or assume that she was divorced and then not further check into the matter? ...
Q. [by plaintiff's counsel]: My next question is, assume that one Mr. Ramsey, her former husband, told her, Ms. Rebouche, that he would file for a divorce, and further assume, too, that Ms. Rebouche was later told at some later date that her former husband had remarried, and, number three, assume that Ms. Rebouche did not have any contact with her former husband for a period of about seven years. Would Doris Rebouche be the type of person who would believe that she was divorced from her former husband and that she could remarry?
The early jurisprudential rule was that a witness may not give an opinion on an ultimate issue of fact, i.e., whether plaintiff was in good faith when she married Mr. Rebouche. However, there has been a move away from such a hard and fast rule. Gage v. St. Paul Fire & Marine Insurance Co., 282 So.2d 147 (La.App. 3rd Cir.1973) writs denied 284 So.2d 602 (La.1983); McCormick on Evidence, § 12, (2d Ed 1972).
In the present case, while the better practice would have been to admit the questions and their answers, the trial court's failure to do so did not harm the plaintiff. The expert was allowed to give ample opinion testimony regarding typical reactions of a person with the psychological and intellectual make-up of the plaintiff. If any error existed in the failure of the trial court to allow the expert to answer these specific questions, we are satisfied that the error was harmless in light of the *815 entirety of the expert testimony presented by Mr. Rosenweig.

POLYGRAPH EXAMINATION
The plaintiff alleges the trial court erred in failing to admit a polygraph examination of the plaintiff on the issue of her good faith belief that she was married to the decedent. We affirm the trial court judgment.
In Louisiana, the leading case of State v. Catanese, 368 So.2d 975 (La.1979), held that the results of polygraph examinations are inadmissible in criminal trials. Such tests were held inadmissible for three reasons. First, the court expressed a fundamental concern that the trier of fact would be apt to give almost conclusive weight to the polygraph examiner's opinion. Second, because of the potentially decisive character of polygraph evidence, the court was concerned about the quality of such evidence. At that time, there was no mechanism for licensing or regulation of polygraph examiners as now exists in LSA-R.S. 37:2831 et seq. Finally, the court reasoned that if litigants were afforded an adequate supply of highly qualified polygraph experts, extensive procedural safeguards should be established, either by court rule or legislation, before the introduction of polygraph tests at trial. The rule remains that polygraph tests are not admissible in criminal trials.
In civil cases, such test results have also been excluded. Associates Financial Corporation v. Carrick, 441 So.2d 1311 (La. App. 2d Cir.1983); Manale v. Department of Police, 376 So. 2d 607 (La.App. 4th Cir. 1979). The language in Catanese indicates that admissibility in proceedings other than criminal trials is largely within the discretion of the trial court. In the present case, we find that the trial court did not abuse that discretion in the exclusion of plaintiff's polygraph test results.

CONCLUSION
For the above stated reasons, we affirm the trial court judgment holding that the plaintiff, Doris D. Rebouche, was not the putative spouse of the decedent, Joseph Y. Rebouche, and in sustaining defendant's exceptions of no right of action on those grounds. Costs in this court and below are assessed to plaintiff-appellant.
AFFIRMED.