ODOM, Justice.
 

 Plaintiff owns certain property in the city of New Orleans which formerly belonged to the Presbyterian Hospital. The property was acquired on January 24, 1930. Admittedly the property, while owned by the Presbyterian Hospital, was exempt from taxation under section 4, article 10, of the Constitution; the same being “property devoted to charitable undertakings.” The property was not assessed or taxed for the years 1928 and 1929. But, having been purchased on January 24, 1930, by plaintiff, it was assessed to it for
 
 *949
 
 .that year. Plaintiff brought this suit to have ■the property declared exempt from taxation ■for the year 1930, to have the assessment ■declared void, and to enjoin the tax collector from selling it for the taxes.
 

 The defense is that the property, though exempt from taxation while owned by the hos< pital, was not exempt for the year 1930, having been acquired by plaintiff on January 24. There was judgment in the lower court for plaintiff as prayed for, and the defendants appealed.
 

 The case was submitted on an agreed statement of facts which shows that the Presbyterian Hospital of New Orleans was a non-trading corporation, organized under the laws • of Louisiana for charitable purposes, and that it practiced charity; that all the property here involved was owned by it and was “devoted to charitable undertakings,” and was used for these purposes “and not leased for profit or income,” and that the same was ■ exempt from taxation under section 4, article 10, of the Constitution of 1921; that on ; December 12, 1927, it granted a mortgage on all its property in favor of the plaintiff, which mortgage was not paid when due. Plaintiff obtained judgment against the hospital for the amount of the loan on October 8, 1929, but no action was taken until December 9, 1929, when a writ of fieri facias was issued and the property seized thereunder.
 

 On December 6, 1929, plaintiff notified the physician in charge of the hospital that it would proceed to seize all the property on the 9th of that month. As a seizure of the movables necessarily meant the closing of the hospital, the physician in charge removed all ■the patients therefrom on that date, and all hospital operations were discontinued at that time. The property was seized on December 9, and remained under seizure until January 24,1930, when it was adjudicated by the sheriff to plaintiff. None of the property involved in this suit was used or occupied by any one until after January 24, 1930, and no portion thereof was leased for profit or income between December 9, 1929, when it was seized, and January 24, 1930, when it was adjudicated to plaintiff. .A formal deed was executed by the sheriff in accordance with the adjudication made on January 24.
 

 1. The seizure of the property under fi. fa. on December 9, 1929, divested the hospital of legal possession on that date but not of ownership. Its ownership was divested on January 24, 1930, when the property was adjudicated to plaintiff. The property was therefore owned by the hospital for 24 days in 1930. This is conceded by both sides, and it is admitted that the Presbyterian Hospital devoted the property to charitable purposes and that it practiced charity. It was therefore exempt from taxation while owned and used for such purposes by the hospital. But it is contended by defendant that the property lost its exempt status on December 9, 1929, when it was seized by the sheriff under the writ of fi. fa., on which date the hospital was ousted of legal as well as actual possession. It is argued that, inasmuch as the hospital did not possess the property after the seizure, the property could neither be devoted to nor used by it for charitable purposes, and for that reason it lost its exempt status as of that date.
 

 When property becomes exempt from taxation by virtue of the purpose for which
 
 *951
 
 it is acquired and the use made of it, the duration of the exemption depends upon the length of time it is so devoted and used. The exempt status ceases when the property is no longer devoted to or used for the purpos.es which give rise to the exemption, or, as stated by Mr. Cooley, in his work on Taxation, vol. 2, § 716, p. 1500:
 

 “If the exemption of property is based upon the use to which it is put, the exemption ceases when the use ceases.”
 

 This means that the right of exemption is lost when the use is voluntarily abandoned or thrown away or its possession is voluntarily forsaken by the owner. When property once becomes devoted or dedicated to charitable purposes and is used as such and for that reason acquires an exempt status, that .status remains until the property and its uses are abandoned, and by that we mean voluntarily and intentionally abandoned. It is uniformly held that, where houses of public worship and property owned by charitable institutions are abandoned by the owners, the exempt status of the property ceases with abandonment, but a reading of the cases will show that the holding was based upon the finding that there was a voluntary and intentional abandonment. The mere fact of abandonment alone will not suffice to defeat the right of exemption once established. Reason dictates the wisdom and necessity for the rule established by the courts, and law sanctions it. The property and rights of individuals are ofttimes abandoned by reason of circumstances and exigencies over which they have no control, such as war, plague, epidemic, or flood, exigencies brought about by “the act of God.” To hold that one’s property or rights are lost by abandonment under such circumstances would be punishing him for his adversities.
 

 The general rule relating to the loss of property or rights by abandonment applies as well to the right of exemption from taxation once established in favor of property devoted and used for religious or charitable purposes. We quote the following from Cyc. vol. 1, pp. 4, 5, 6, under the general heading “Abandonment”:
 

 “A.
 
 In General
 
 — . 1. Rule Stated. Abandonment includes both the intention to abandon and the external act by which the intention is carried into effect.
 

 “2. Abandonment of Property. To constitute abandonment in respect of property, there must be a concurrence of the intention to abandon and an actual relinquishment of the property, so that it may be appropriated by the next comer.
 

 “3. Abandonment of Right. To constitute abandonment in respect of a right secured, there must be a clear, unequivocal, and decisive act of the party; an act done which shows a determination in the individual not to have a benefit which is designed for him.
 

 “4. Intention as Element. In determining whether one has abandoned his property or rights, the intention is the first and paramount object of inquiry; for there can be no abandonment without the intention to abandon. Thus, in jurisdictions recognizing the doctrine that title to land may be lost by abandonment, ceasing to cultivate land, or mere inaction and removal to another place, is not enough, without some act of disclaimer or other fact importing and showing a positive
 
 *953
 
 intention to abandon all claim of ownership. So the mere suspension of the exercise of a right, without evidence of the intention to abandon it, is not sufficient to destroy the right. The intention to abandon is to be derived from all the facts and circumstances •of the case.”
 

 “Abandonment means an absolute relinquishment ; a giving up; a total desertion.” 1 Corpus Juris, 5.
 

 “Abandonment” means “the act of forsaking or leaving.” The characteristic element of abandonment is voluntary relinquishment. 1 R. C. L. 1.
 

 The case of Old South Society v. City of Boston, 127 Mass. 378, involved the exemption from taxation of certain church property. The congregation had made arrangements to build a new church and had secured temporary .quarters elsewhere. It was held that the old property was not exempt because it had been voluntarily and intentionally abandoned by the congregation as a place of worship. But in the course of its opinion the court said:
 

 “An unfinished church edifice, in the process of construction, is exempt, and so also is a house of worship the use of which has been temporarily interrupted. The reason of the exemption in such cases is that, although the property is not actually in present use for purposes of religious worship, yet it is held in good faith for such uses and none other.”
 

 The case of Bradford v. Mote, Tax Collector, a Delaware case,' reported in 2 Marv. 159, 42 A. 445, 446, involved the exemption from taxation of a manufacturing plant which was exempt under the law by reason of its being such. The property was assessed because the plant had ceased operations and it was contended by the tax collector that the exempt status of the property was at an end because it had been abandoned for the purposes which brought about the exemption. The court held against the'tax collector, saying:
 

 “The suspension of work in the plant was by reason of want of funds to carry on the business. Under these circumstances, it would be a very harsh construction of the statute to say that this property was not exempt from taxation at the time of the levy. In our judgment, it is exempt. To hold otherwise would be a hardship on the unsuccessful investor.”
 

 These cases are illustrative of the principle involved in the present case. The Presbyterian Hospital lost possession of its property when it was placed in custodia legis by virtue of the seizure on December 9, 1929, and on that day it abandoned the property and its use, not intentionally or voluntarily, but due to conditions over which it had no control. Its operations had not been successful from a financial standpoint. It was' involved in debt, and its creditors were pressing payment, and one of them seized. The seizure ousted them of possession, and, as the personal property, while under seizure, could not be used for hospital purposes, the property and its use- had to be abandoned. The owners were legally and actually forced out. The actual use of the property for the purposes which brought about the exemption ceased on the day it was seized, and it is contended by the taxing authorities that its exempt status ended on that day.
 

 
 *955
 
 Under
 
 the
 
 circumstance here shown, we do not think so. The facts are that the promoters and owners of the hospital, while probably discouraged, did not consider that they had lost their property by virtue of its seizure under judicial proceedings. They knew that their ownership would be divested only by an adjudication of it to another. Hence immediately after its seizure they set about to raise funds in New Orleans to lift the seizure and thereby procure its release back to them. They failed in their first attempt to secure the funds. The seizing creditor expressed a willingness to withhold further proceedings pending the outcome of their effort to raise funds. In the latter part of December, Dr. Barr, president of the Hospital Association, went to New York City to enlist the aid of the national officers of the Presbyterian Church in raising funds.
 

 He discussed the situation at length with Mr. George C. Barber, chairman of the budget and finance committee of the national organization of the Presbyterian Church, and on December 27 Mr. Barber wired the plaintiff, the seizing creditor, that he had
 
 gone
 
 over the details with reference to the financial difficulties of the hospital, and further stated:
 

 “Would request that if possible sale of property be postponed to February first in order to allow me to ascertain what if any thing can be done by important individuals. Am optimistic as to possibilities. Will appreciate wire reply today.”
 

 On the same day plaintiff’s representative wired Mr. Barber in reply that it was impossible to postpone sale set for January
 
 24
 
 without considerable expense, and that:
 

 “It is estimated that Hospital has equity of about three hundred thousand dollars in. property and it will take about five hundred thousand dollars to clear the property of mortgage debt. If your organization will raise between two hundred and two hundred and fifty thousand dollars by January twenty-fourth and agree to stand behind the refinancing, we will be willing to advance three: hundred fifty thousand dollars on first mortgage bonds on this property and cooperate-with you in every way to save the equity-above mentioned.”
 

 Mr. Barber then had Mr. Kohlmeyer, one of the vice presidents of the Interstate Trust
 
 &
 
 Banking Company of New Orleans, call on Mr. Vincent, president of the Orleans Bank. & Trust Company, to ascertain what could, be done to postpone the sale, and Mr. Vincent advised that the sale would be postponed if the national Presbyterian Church would guarantee to the Orleans Bank & Trust Company the cost of carrying the property for the period of extension desired and suggested that Mr. Barber arrange for a deposit with the bank of $15,000, which would represent the expense of a postponement for the period desired. Nothing came from the efforts of Dr. Barr and Mr. Barber to raise the required funds, and no guaranty was made to protect the bank against the costs of carrying the property for the period of extension desired, and the sale took place on January 24, 1930.
 

 Thus it is clear that those representing the hospital were carrying on negotiations-with the banks and with Mr. Barber looking to the ultimate release of the property from seizure and its restoration to the uses.
 
 *957
 
 for which it was dedicated. These negotiations were carried on while the seizure was pending, which shows conclusively that they never abandoned the hope or intention of holding their property in the status which it had acquired. There was no intentional or voluntary abandonment or release of the property, and, as it was owned by the hospital until its adjudication to the bank on January 24, 1930, its exempt status continued to that date.
 

 2. The taxable status of property relates to a certain day in each year. There must be some day of the year as of which the power to tax property at all is determined. That day fixes the power to tax with reference to whether the property was exempt from taxation on that date. If the property is exempt on the tax day, it is not liable for taxes during that fiscal year, although it afterwards goes into the hands of those not exempt.
 

 Mr. Cooley in his work on Taxation, vol. 2, p. 1500, § 712, says:
 

 “Conceding that the exemption from taxation in a particular case is not transferable, the transfer of exempt property after the tax day does not make it taxable for the current year, even though the property is not exempt in the hands of the transferee.”
 

 3. The only remaining question is, What is the tax day in Louisiana? The question is not open, but is settled by repeated decisions of this court. The “tax day” is January 1st. If property is subject to taxation on January 1st of any given year, it is subject to taxation for the entire year even though it later in the year goes into the hands of those who are exempt. If it is exempt on the 1st day of January, it is exempt for the entire year even though later in the year it passes into the hands of those not exempt. Jasper & East Ry. Co. v. Martin, Tax Collector, 142 La. 1047, 78 So. 112, and cases therein cited; Gulf Public Service Corporation v. Louisiana Tax Commission, 167 La. 757, 120 So. 286.
 

 In the very recent ease of Mexican Petroleum Corporation v. Louisiana Tax Commission, 173 La. 604, 138 So. 117, it was held that property for any particular year must be assessed on the basis of conditions existing on January 1st of that year.
 

 Counsel for defendants cite and rely upon the case of Citizens’ Bank & Trust Co. v. Board of Assessors, 129 La. 1091, 57 So. 528, 38 L. R. A. (N. S.) 1157. That case is not in harmony with prior or subsequent eases, and is not controlling.
 

 The.property here involved was exempt from taxation on January 1, 1930, and its assessment to plaintiff for that year is null and void.
 

 The judgment appealed from is affirmed, with costs.