461 So.2d 357 (1984)
In re SUCCESSION OF James GORDON.
Emma Cromedy GORDON and Elvira Gordon Sanders, Plaintiffs-Appellees,
v.
Elizabeth GORDON and Linda Maxine Gordon Mims, et al., Defendants-Appellants.
No. 16656-CA.
Court of Appeal of Louisiana, Second Circuit.
December 5, 1984.
Rehearing Denied January 4, 1985.
Writ Denied March 8, 1985.
*358 Jones & Jones by Benjamin Jones, Monroe, for defendants-appellants.
Hamilton & Carroll by Orlando N. Hamilton, Jr., Oak Grove, for plaintiffs-appellees.
Before FRED W. JONES, Jr. and JASPER E. JONES, JJ., and PRICE, J. Pro Tem.
PRICE, Judge Pro Tem.
Elizabeth Weston Gordon, alleged putative wife of decedent, James Gordon, and her children appeal the judgment of the trial court awarding all of the property of the decedent's succession to Emma Cromedy Gordon, the legal wife of decedent and to Elvira Gordon Sanders, the child of that marriage. We reverse the judgment of the trial court for the following reasons.
Emma Cromedy Gordon and Elvira Gordon Sanders filed a petition on September 10, 1982 alleging that decedent, James Gordon, died intestate on August 11, 1972. Plaintiffs alleged that the deceased was legally married only once on September 8, 1928 to Emma Cromedy Gordon. Of this marriage, one child, Elvira Gordon Sanders, was born on January 24, 1931. Plaintiffs alleged that decedent left Emma Gordon and without dissolving his marriage to her, contracted a second marriage to Elizabeth Weston Gordon. Plaintiffs argue that at the time of her marriage, Elizabeth Weston Gordon knew or was in a position to know of decedent's valid marriage to plaintiff, Emma Gordon and thus was in bad faith. Therefore, the civil effects of the marriage could not flow to Elizabeth Weston Gordon and the children of that union. Plaintiffs alleged that the marriage of decedent to Emma Cromedy Gordon was never legally dissolved before the death of James Gordon, thus the civil effects from the marriage continued to exist until decedent's death in 1972.
It appears from the record that the sole asset of the succession is approximately 40 acres of land located in West Carroll Parish, Louisiana purchased on September 30, 1936.
Plaintiffs argued that all the property belonging to decedent was in the community *359 of acquets and gains existing between decedent and Emma Cromedy Gordon. Thus as the widow of decedent, Emma Cromedy Gordon, should be entitled to one-half of the community property. Plaintiffs further alleged that Elvira Gordon Sanders was the sole, legitimate heir of decedent and was entitled to inherit from decedent to the exclusion of the illegitimate heirs since the right to inherit equally with legitimate children is not retroactive to the date of decedent's death in 1972.
Elizabeth Weston Gordon and the children, Barbara Gordon Lepley, Annette Gordon Redmond, Linda Gordon Mims, James L. Gordon, Marion Gordon Brooks, Lawrence W. Gordon, Harold D. Gordon, and Ira L. Gordon filed an answer and intervention alleging that Elizabeth Weston Gordon married the decedent on July 1, 1934. Of this union, nine children were born, eight of which survived.[1] Elizabeth Gordon alleged that she and the decedent had lived together as man and wife and decedent was designated as the father on the birth certificate of each child. Elizabeth Gordon alleged that she and decedent purchased the property in 1936 and she is reflected on the deed of the property as being decedent's wife.
Elizabeth Gordon alleged that at the time of her marriage, she was informed by decedent that he had divorced Emma Cromedy Gordon in Chicot County, Arkansas. The prior marriage and divorce was recited in the marriage license. Elizabeth alleged she had no knowledge of any impediment to her marriage and believed it to be valid. Elizabeth states there was no notice until the late 1960's that a divorce had never been obtained. Elizabeth and the children further alleged that decedent was in good faith in contracting the marriage. Elizabeth claimed that she was entitled to recover from the succession the amount of taxes paid on the property, the enhanced value of the property from improvements and amounts paid on indebtedness secured by the property should her interest in the property be found to be less than one-half.
Elizabeth Gordon argued, in the alternative, that she was the owner of the property by virtue of ten year or thirty year acquisitive prescription.
The trial on this matter was held on September 15, 1983.
Emma Cromedy Gordon testified that she married decedent in Eudora, Arkansas in 1928. Her home at that time was at Brown's Crossing, Arkansas, close to the Arkansas-Louisiana state line. Emma attended St. Paul's Church in Arkansas and Blooming Shade Church in Louisiana. Apparently, the churches held services on alternating Sundays and members regularly attended both churches. It appears that the Gordon, Cromedy, and Weston families attended these churches. Emma testified that she knew Elizabeth Weston Gordon who lived nearby in Kilbourne, Louisiana and several members of the Weston family had inter-married members of the Cromedy family.
After their marriage, Emma and decedent lived at her father's place in Brown's Crossing, and the couple continued to attend church where they would sometimes see Elizabeth Weston Gordon. Emma testified that Elizabeth knew that she was married to decedent. Elvira Gordon Sanders was born in 1931, no other children were born of the marriage. Emma testified that decedent left her approximately two years after Elvira was born but she never received notice of any divorce proceedings. Emma remained at her parent's place. Emma saw Elizabeth and decedent at church outings from time to time. Emma testified that the whole community had a serious religious involvement in the churches. It appears that decedent, after leaving Emma, lived approximately two and one-half miles away in Louisiana. Emma testified she moved to California in 1944 and lived there until approximately 1956 when she returned to Eudora. In 1962, Emma moved to Chicago and worked *360 there for six years. While living away, Emma would regularly return on vacation to visit with her daughter. On these trips, she would occasionally see decedent and Elizabeth. Elvira lived with her mother and Cromedy grandparents for several years and then with the decedent's parents after Emma moved to California.
Emma testified that she did not know of any wedding between decedent and Elizabeth. Emma testified that in 1969, 1970, and 1971 she had conversations with decedent who purportedly told Emma he would never divorce her. Emma testified that she never had received notice of any divorce proceedings and that during her years away, her family knew where to reach her.
Elvira Gordon Sanders testified that decedent would come to visit her in Eudora when she was very young. Sanders began living with decedent's parents in 1944 and remained there until she was married in 1950. Sanders testified that her father lived at his place with Elizabeth and she visited at her father's house. Sanders testified that she considered the children of decedent and Elizabeth to be her brothers and sisters and that they were considered to be a family in the community. However, Sanders testified that she and her father had never discussed a divorce between her parents. In later years, Elizabeth moved to Arizona and would return to visit occasionally. Sanders testified, however, that decedent never permanently moved to Arizona but remained in Louisiana.
Elizabeth Weston Gordon did not testify at trial. One of her children testified that she was suffering from multiple sclerosis. It was asserted that she was too ill to testify.
Mae Weston Lacy, sister of Elizabeth Gordon, testified that she attended the wedding of Elizabeth and the decedent. Lacy testified that the wedding was not secretive, rather, there were many people invited as guests. Lacy testified that the couple was considered to be man and wife by the community and there was never a suggestion to the contrary.
Lacy testified that sometime in the 1950's she began seeking a divorce from her first husband and was advised by decedent of an attorney in Arkansas. Lacy testified that decedent indicated to her that this is where he had obtained his divorce.
Lacy testified that she consulted with the attorney and was given a document. However, a later search of records revealed that her divorce proceedings had never been completed.
Noreen Edwards, former employer of Elizabeth, testified that Elizabeth had worked for her for approximately 10 years. Edwards testified she had always considered Elizabeth and decedent to be married and there was never a suggestion to the contrary.
James Collier, neighbor of Elizabeth and decedent, testified the couple was held out to the community as husband and wife.
Linda Gordon Mims, the daughter of Elizabeth and decedent, testified that she always considered her parents to be married. However, in 1969, a Cromedy niece made a statement to several members of the Gordon family, including Mims, that decedent did not have a divorce from Emma. Mims testified that decedent was upset and displayed to her a worn, old paper which was claimed by decedent to be his divorce paper. Mims stated she accompanied decedent to an attorney's office and it was later learned that there were no records of a divorce in Arkansas. Decedent then initiated divorce proceedings in Arizona.
Mims testified that after the move to Arizona in 1968, decedent spent more of his time in Arizona although he would return to Louisiana from time to time. Decedent died in Louisiana and Mims testified that several of his personal effects could not be found, especially a black book in which decedent kept his papers. Mims testified that her father had become extremely aggravated when her sister began living with a man and that decedent "strictly" did not believe in cohabitation.
*361 Marion Gordon Brooks and Ira Gordon testified that they believed their parents to be married and the family lived happily together for almost forty years. Ben and Joe Cromedy, brothers of Emma Cromedy Gordon, testified by deposition. Joe Cromedy attended the wedding of Elizabeth and the decedent and the brothers generally testified that the couple lived in the community as husband and wife.
It is clear from the evidence that there was no record of a divorce action between James Gordon and Emma Cromedy Gordon being filed between the years 1928-1934 in either West Carroll Parish, Louisiana or Chicot County, Arkansas. Decedent's death certificate was admitted reflecting Elizabeth Gordon as his wife. The deed to the property recites as vendee, "James Gordon, husband of Elizabeth Gordon." The marriage license of decedent and Elizabeth Gordon was also admitted into evidence reflecting that James Gordon was divorced from Emma Gordon. There is no evidence, however, as to whether Elizabeth and decedent remarried after decedent's divorce in Arizona. It appears from the record that decedent lived as husband and wife from their marriage in 1934 to decedent's death in 1972, a period of thirty-eight years.
The trial court found that neither James Gordon nor Elizabeth Gordon were in good faith in contracting the putative marriage. The court noted that decedent knew he had married Emma, had a child by her, and then abandoned them to take up with Elizabeth Weston Gordon. The court found that decedent was charged by the knowledge that the marriage to Emma had not been dissolved and thus could not have been in good faith. The court found that in this small community, Elizabeth knew that Emma and decedent were married, thus she was obliged to make a reasonable investigation to confirm that the marriage had been dissolved. Finding that the preponderance of the evidence negated any possible legal good faith in the confection of the marriage of Elizabeth Gordon and James Gordon, the court awarded ownership of the property to Emma as the surviving spouse in the community, and to Elvira as the sole heir. The children of the decedent and Elizabeth, as illegitimates, were not entitled to inherit any of decedent's property under the authority of Succession of Brown, 388 So.2d 1151 (La.1980) and Succession of Clivens, 426 So.2d 585 (La.1982).[2]
The court further found that Elizabeth Gordon was not entitled to ownership of the property by virtue of either the ten or thirty year acquisitive prescription.
The court reserved the right of the intervenors to assert claims for reimbursement of Ad Valorem taxes which may have been paid on the property between the years 1973 to 1982. Intervenors filed a Motion for a New Trial which was rejected by the court.
It appears that the main issue before this court on appeal is whether the trial court erred in finding that James Gordon and Elizabeth Gordon were in bad faith and thus they and their children were not entitled to the benefits of a putative marriage.
It was clearly established at trial that James Gordon married Emma Cromedy Gordon. There is no evidence in the record that decedent obtained a valid divorce before contracting a second marriage with Elizabeth Weston Gordon. Thus, decedent had a legal impediment and was incapable of contracting a second marriage. La.C.C. art 93.
The Civil Code provides in pertinent part:
Art. 117.
The marriage, which has been declared null, produces nevertheless its civil effects as it relates to the parties and their *362 children, if it has been contracted in good faith.
Art. 118.
If only one of the parties acted in good faith, the marriage produces its civil effects only in his or her favor, and in favor of the children born of the marriage.
As noted by the Supreme Court in King v. Cancienne, 316 So.2d 366 (La. 1975), the "... theory of putative marriages is based on the canonical law of France and has no Roman law source. Because many persons in good faith ran the risk of contracting null marriages, `*** [a] palliative had to be found at any price.' 1 M. Planiol, at 1094." at p. 370. The court further noted that the "... simple import of the putative spouse provisions of La.C.C. arts. 117 and 118 is to cause civil effects of marriage to flow in favor of the party who marries in good faith and in favor of the children born of that marriage, as though the marriage had been legally consummated." at p. 371. The articles have been broadly construed in favor the children of the marriage and the parties in good faith in determining the civil effects of a putative marriage. Cortes v. Fleming, 307 So.2d 611 (La.1973).
In the context of a putative marriage, it is well-settled that good faith is defined as an honest and reasonable belief that the marriage was valid and there existed no legal impediment to it. Whether a party is in good faith when entering an invalid bigamous marriage is a subjective inquiry and necessarily would depend on all the circumstances presented in each particular case. Galbraith v. Galbraith, 396 So.2d 1364 (La.App. 2d Cir.1981) and citations therein. See also Hart v. Hart, 427 So.2d 1341 (La.App. 2d Cir.1983), Succession of Davis, 142 So.2d 481 (La.App. 2d Cir.1962), Succession of Zinsel, 360 So.2d 587 (La.App. 4th Cir.1978), and Succession of Jene, 173 So.2d 857 (La.App. 4th Cir. 1965).
The "... issue of good faith of the parties to an invalid marriage presents a question of fact which must be determined by the trial judge and his findings are entitled to great weight. Gathright v. Smith, 368 So.2d 679 (La.1978)." Galbraith v. Galbraith, supra, at p. 1369.
Further, if there is any doubt as to whether the parties contracted a second marriage in good faith, it is to be resolved in favor of good faith. Succession of Primus, 131 So.2d 319 (La.App. 1st Cir.1961) and citation therein. See also Succession of Davis, supra, and Succession of Barbier, 296 So.2d 390 (La.App. 4th Cir.1974). There "... is a presumption of good faith in favor of the party without a legal impediment in an alleged putative marriage." Succession of Jene, supra at p. 860 and numerous citations therein. See also Succession of Zinsel, supra. However, it appears that this presumption does not run in favor of a putative spouse who has been shown to have a prior, undissolved marriage. Rather, the burden would shift to that party to show that the second marriage was entered into in good faith. Gathright v. Smith, supra.
In light of the above jurisprudence and the particular facts of this case, it is the opinion of this court that the trial court was manifestly erroneous in finding that James Gordon and Elizabeth Gordon were in bad faith.

The Good Faith of Elizabeth Weston Gordon
The record evidences that Elizabeth Weston Gordon was in good faith when she married James Gordon. The parties lived in a small, closely-knit, rural, religious community and all attended the same church. Elizabeth's father was a minister and she appeared to be living at home when she married. Several members of the Weston family and Cromedy family had inter-married and Emma and Elizabeth knew and saw each other from time to time. It appears from the evidence that Elizabeth knew that decedent and Emma had married. While the court was not aided by Elizabeth's testimony, it does not appear from the facts that Elizabeth had any reason *363 to believe that an impediment existed to her marriage.
The facts reveal that Elizabeth and decedent had a wedding with a number of guests in attendance including Emma's brother. The parties' marriage license indicated that decedent was divorced. After the wedding, the couple remained in the same community, continued to attend the same church that Emma attended and eventually bought property there on which they settled. The majority of the witnesses testified the community believed the couple to be man and wife. Elizabeth and decedent had nine children, eight of which survived, all considered to be children of this marriage. There is nothing in the record to indicate that Elizabeth had any reason to believe that decedent was never divorced until sometime in 1969. Emma Cromedy Gordon testified that she saw Elizabeth occasionally. However, there was no evidence that Emma had ever indicated to Elizabeth that she and decedent had not been divorced.
The trial court found that Elizabeth had a duty to investigate whether the marriage of James and Emma had been dissolved.
In examining the issue of the duty to investigate, the Supreme Court in Gathright v. Smith, supra, and numerous citations therein, noted that an older general rule required that when a party knew that his or her spouse had been previously married, that party was not justified in entering the marriage solely on the word of that spouse that he or she was divorced, rather the spouse was under a duty to investigate to determine whether the previous marriage actually had been dissolved.
The court found that the rule was more a rule of evidence or a means of weighing the evidence rather than a rule of law or a legal presumption. The "... fact that the party who is informed of a prior dissolved marriage relies on assurances of the dissolution without conducting an independent investigation does not preclude a finding that he was nevertheless in good faith, when there are circumstances to support that conclusion." Gathright v. Smith, supra, at p. 684.
The circumstances in the instant case would not mandate an investigation by Elizabeth. There is absolutely no evidence that Elizabeth ever received any type of information which would indicate an impediment to her marriage and thus place her under a duty to investigate. As noted earlier, Emma and Elizabeth saw each other on occasion but it does not appear that Emma ever revealed that there had been no divorce. There was no evidence that any other member of the community had somehow indicated Emma and decedent were not divorced or that Elizabeth and decedent were ever regarded by the community as anything other than man and wife. It must be remembered that Elizabeth was a young girl living in a small, rural community. In this particular set of facts, it is the opinion of this court that Elizabeth had an honest and reasonable belief her marriage was valid and that no legal impediment existed to her marriage. Emma Cromedy Gordon and Elvira Gordon Sanders failed to rebut this presumption, that is, there is no proof that Elizabeth had any reason to believe in the existence of any impediment which would render her marriage to decedent invalid and plus place her in bad faith.

The Good Faith of James Gordon
It is the opinion of this court that James Gordon was in good faith when he contracted his second marriage to Elizabeth. Again, the court did not have the benefit of decedent's testimony in determining this issue. However, the record evidences that decedent believed he was divorced and had honest and reasonable belief his second marriage was valid.
The testimony established decedent was a hard-working, honest and religious man who objected to cohabitation. Mae Weston Lacy testified that decedent had referred her to an attorney for a divorce indicating that he had obtained a divorce there. Lacy consulted the attorney and later learned that her divorce proceedings had not been completed. Although, it was *364 established that the attorneys referred to in Lacy's testimony were not admitted into practice at the time of decedent's alleged divorce, it appears from the evidence that decedent had a reasonable belief he was divorced. It appears to this court that decedent and Lacy fell prey to a somewhat dubious practice. As noted earlier, decedent married Elizabeth in the same small community and eventually settled there. Decedent did not conceal his prior marriage with Emma when he and Elizabeth applied for their marriage license. Rather, he declared he was divorced from "Emma Gordon". His wedding was attended by Emma's brother. Decedent continued to see his daughter, Elvira, who considered his children with Elizabeth to be her brothers and sisters. Again, the determination of good or bad faith must be considered with regard to the peculiar facts and circumstances of each case. Decedent lived in a rural community and the time of the alleged divorce was the early 1930's. Quite simply, people at that time were not as educated or familiar with the intricacies of divorce as in the present. The course of decedent's conduct, particularly in remaining in the community after his marriage to Elizabeth to raise his family, evidences that he believed he was divorced. Decedent's good faith is further evidenced by his actions in 1969 when he was informed he was not divorced from Emma. Linda Gordon Mims testified decedent appeared upset and displayed an old paper which he indicated to be his "divorce papers". Decedent consulted an attorney and later initiated divorce proceedings in Arizona.
As enumerated earlier, it appears from the record that decedent had not obtained a divorce from Emma thereby creating an impediment to his second marriage to Elizabeth. Thus, the burden shifted to him or his heirs to show his good faith as he had a prior, undissolved marriage. The only evidence indicating that decedent was in bad faith was the self-serving testimony of Emma. Emma testified that decedent had made statements to the effect that he would never divorce her. It is this court's opinion that the burden of proving decedent's good faith was met.
Finding that the parties were in good faith, the civil effects of marriage would flow to both of them. One civil effect is the legitimacy of the children of the putative marriage. Succession of Chavis, 211 La. 313, 29 So.2d 860 (1947). See also Cortes v. Fleming, supra. Another civil effect is the right of a putative wife to share in the community property. Prince v. Hopson, 230 La. 575, 89 So.2d 128 (1956).

Division of Community Property
As noted previously, it appears from the record that the sole asset of the succession is approximately forty acres of property. It is well settled that in Louisiana, property purchased by either spouse during the existence of a community of acquets and gains is presumed to be community property. Prince v. Hopson, supra. In a similar case wherein both parties to a putative marriage were found in good faith, the Supreme Court in Prince v. Hopson, supra, examined the appropriate distribution of property between the legal wife, putative wife and heirs. The court looked to older cases which divided the property acquired in a putative marriage in equal halves between the legal and putative wife. However, it appeared that the good faith of both parties to the second marriage was not a factor and the facts of most of those cases clearly demonstrated that the husband was in bad faith.[3] The court found that following this rule when both parties were in good faith would essentially violate La.C.C. art. 117 by denying the husband and his heirs the civil effects of the second marriage. After an extensive review of french commentators, the court found the most equitable distribution of the property *365 would be one-fourth interest each to the legal and putative wife and one-half interest to the heir of the decedent-husband.
In the instant case, the property was acquired during the putative marriage. However, as decedent's first marriage was not dissolved, the community of acquets and gains was still in existence. In other words, the legal and putative community were in co-existence. Thus, it would appear to this court that as both parties to the putative marriage were in good faith, the distribution enumerated in Prince v. Hopson would be the correct and most equitable result in the instant case. Thus, Emma Cromedy Gordon and Elizabeth Weston Gordon would each receive a one-fourth interest in the property and the heirs of decedent would receive the remaining half of the property in equal portions. There is no evidence in the record to indicate that the termination of the legal community by the Arizona divorce, provided this divorce was valid, would have any effect on the above distribution of the property in the succession.
Finding that the decedent and Elizabeth Weston Gordon contracted their marriage in good faith, this court now need not consider intervenors' alternative arguments that Elizabeth acquired ownership of the property by means of ten or thirty year prescription or that the trial court erred in failing to grant intervenors' motion for a new trial.
There is not sufficient evidence in the record as to the exact amount of property taxes which may have been paid by the intervenors or to determine the amount of payments made by a particular intervenor. Further, there is no evidence as to the enhanced value of the property, if any, due to improvements. Although this court may not pass upon these issues on this appeal, the rights of the intervenors to assert these claims in a future proceeding is hereby reserved.
For these reasons, the judgment in favor of Emma Cromedy Gordon and Elvira Gordon Sanders is reversed. Judgment is rendered herein recognizing Emma Cromedy Gordon and Elizabeth Weston Gordon as owners of an undivided one-fourth interest each and recognizing Elvira Gordon Sanders, Barbara Gordon Lepley, Linda Gordon Mims, Ira L. Gordon, Harold D. Gordon, Marion Gordon Brooks, Annette Gordon Redmond, James L. Gordon and the unopened Succession of Lawrence W. Gordon as owners of an undivided one-ninth interest each in the remaining half of the following described property:
That portion of ground, together with all of the buildings and improvements thereon, and all of the rights, ways, privileges, servitudes, appurtenances and advantages thereunto belonging or in anywise appertaining, lying, being and situated in the Parish of West Carroll, State of Louisiana, particularly described as follows, to-wit:
The Southwest Quarter of the Northwest Quarter (SW¼ of NW¼) of Section Nine (9), Township Twenty-Three (23) North, Range Eleven (11) East, LESS AND EXCEPT a strip of land fifteen (15) feet wide off the South side of said land for a road. Containing 38.03 acres, more or less.
SUBJECT TO a right-of-way 30 feet wide for a public road along the West side of said land, in favor of Police Jury granted by James Gordon, dated September, 1938, recorded in Conveyance Book 9, page 250 of the records of West Carroll Parish, Louisiana.
The costs of the proceedings below are assessed to the above named parties in proportion to the amount of the property that they received. The costs of this appeal are assessed to Emma Cromedy Gordon and Elvira Gordon Sanders.
REVERSED.
NOTES
[1] From the record, it appeared that Lawrence Gordon had died during the pendency of these proceedings before the date of trial; however, the date of death is not clear.
[2] In Succession of Brown, supra, LSA-C.C. art. 919 excluding acknowledged illegitimates from participating in their father's succession when he was survived by legitimate descendants, ascendants, collateral relatives or a surviving spouse was declared to be unconstitutional. In Succession of Clivens, it was held that the Brown decision was only given retroactive effect to the effective date of the Louisiana Constitution of 1974.
[3] This rule was followed by this court in Succession of Choyce, 183 So.2d 457 (La.App. 2d Cir. 1966). In that case, the husband was found in bad faith in contracting his second marriage. The property was divided equally between the legal and good faith putative wife to the exclusion of children born in the two marriages.