Judgment rendered November 17, 2021.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 54,168-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

SUCCESSION OF WILLIE C. BURNS

* * * * *

Appealed from the
Second Judicial District Court for the
Parish of Claiborne, Louisiana
Trial Court No. 10,731

Honorable Glenn Fallin, Judge

* * * * *

| | |
|---|---|
| RITA KAY BACOT | Counsel for Appellants, Annie Burns, Sharon Burns & Estelle Green |
| ALAN PESNELL LAWYER, LLC<br>By: William Alan Pesnell | |
| OFFICES OF CHRIS L. BOWMAN<br>By: Chris Lane Bowman<br>      Colby L. Bowman<br>      Sean Nicholas Crain | Counsel for Appellees James Burns, Willie Burns, & Tommy Burns |
| KITCHENS LAW FIRM<br>By:  Paul E. Kitchens | Counsel for Appellee Silver Burns |

* * * * *

Before MOORE, PITMAN, and COX, JJ.

**MOORE, C.J.**

Annie Burns, the putative wife of the decedent, appeals a judgment that awarded her only 25% of the succession of the common husband, Willie C. Burns, and found that two large certificates of deposit (totaling about $300,000) were not part of the succession but belonged to Burns's son James. For the reasons expressed, we amend to specify the usufruct of the putative and legal spouses, and otherwise affirm.

## FACTUAL BACKGROUND

This contentious case began innocently enough. Burns died on June 1, 2015, at the age of 74. The next day, two of his sons, James and Willie L., filed a motion and order to override the wishes of Annie, whom they alleged to be the "spouse of Decedent," and have an autopsy performed on their father.

The day after that, Annie, alleging that she was the "surviving spouse of the decedent," filed a petition to open Burns's succession. She alleged that Burns had been married twice, first to Silver Cooper, from whom he was divorced and by whom he had three children (Willie L., James, and Tommy), and then to her, Annie, by whom he had two children (Sharon and Estelle). She asked to be named administratrix and attached a detailed descriptive list of community property including four developed lots in Homer, La., and bank accounts at Regions, First Guaranty, and Chase Banks, worth $500,000.

Simultaneously, James filed a motion to be named provisional administrator of his father's estate. He alleged that Burns was "never legally divorced" from his mother, Silver, and, moreover, had executed a

declaration of separation of property from Annie in 2003. In other words, James felt that much of the property that Annie alleged to be "community" was not. The district court appointed James and Sharon, his half-sister, as independent co-administrators.

Burns's first wife, Silver, then intervened asserting that she had married him in 1959, had "never been lawfully divorced," and was his legal surviving spouse. In support, she attached three documents. First was a petition of divorce filed in the Chancery Court of Columbia County, Arkansas, on July 18, 1966, captioned "Sybia Ruth Burns v. W. C. Burns," with an affidavit signed by "Sybia Ruth Burns," and a divorce decree dated August 26, 1966; however, she alleged that her name is not "Sybia" and that she never went by that name. Second was a petition for divorce filed in Claiborne Parish on January 25, 1967, captioned "W.C. Burns v. Sylvia Ruth Burns," with a citation signed by "Sylvia Ruth Burns"; however, she alleged that her name is not "Sylvia," that she never went by that name, and that this petition was never taken to judgment. Third was a report from Robert G. Foley, a certified forensic handwriting analyst in Monroe, who declared that the signatures of "Sybia" and "Sylvia" on the divorce papers were not the handwriting of Silver; they were forgeries.

Soon after this, Sharon (the co-administrator and Burns's daughter by Annie) alleged that the day after their father's death, when everybody was rushing to the courthouse, James (the other co-administrator) had rushed to First Guaranty Bank and cashed out a CD owned jointly by James and Burns worth $150,000, and to Regions Bank and withdrawn from an account owned jointly by James and Burns some $104,000 in cash. Sharon wanted

2

an order directing James to place all this money in the court registry until ownership could be ascertained.[1]

## THE FIRST HEARING

At a hearing in April 2017, the district court heard testimony from Robert Foley, the handwriting expert, and received his forensic report, to the effect that Silver's signatures on all the 1966 and 1967 divorce papers were forgeries.

Silver testified that in 1967, Burns told her he had gotten them a divorce in Arkansas, so she remarried a man named Welcome Boyd, and had two children with him; she later divorced Boyd, and then married a man named Talton Kingsby; she was still living with Kingsby, but had got the marriage annulled when she found out she was still legally married to Burns. One of Silver's daughters (by Boyd) corroborated her mother's testimony.

Annie testified that she married Burns in 1970, but had been living with him for four or five years prior to that. She knew that he had been married to Silver, but believed they were divorced; she was still living with Burns when he died in 2015.

The court ruled from the bench that it accepted the expert's opinion that the divorce papers were forgeries, and found that Silver and Burns were never divorced. However, he added, Annie could still try to prove that she was a putative spouse, under La. C.C. art. 96. The court rendered judgment granting Silver's intervention, and declaring that Silver and Burns were still

---

[1] The appellate record does not show any ruling on this request, but the court later stated that the money was indeed in the registry, and Regions Bank entered a consent judgment to provide all its records to the parties.

3

legally married when he died and that the marriage between Annie and Burns was an absolute nullity.

Annie promptly filed a motion to declare that even though her marriage to Burns was an absolute nullity, she was in good faith when she married him and was entitled to the status of a putative spouse, with all its civil effects, under C.C. art. 96. Silver, of course, opposed this, contending that Annie could not possibly be in good faith.

### THE SECOND HEARING

At a hearing in September 2017, Annie testified, on cross-examination, that she had only a fourth-grade education, and she was using the rent proceeds from the couple's houses to pay her living expenses.

Silver testified that she had known Annie since about 1966; Annie and Burns had started a flirtatious romance at the Jitney Jungle (where Annie shopped with her mother and Burns worked as a courtesy clerk) before he was divorced from Silver; Sharon, Annie's first daughter, would have been conceived before she (Silver) separated from Burns; therefore, Silver thought Annie must have been in bad faith.

On direct examination, however, Annie insisted that Burns had assured her, multiple times, that he had divorced Silver after she "ran off with a * * *."[2]

The court ruled from the bench that Annie had no duty to go to the clerk of court and verify Burns's marital status, and that Annie was a reliable witness. The court therefore declared her a putative spouse, and later rendered judgment declaring her a good faith putative spouse.

---

[2] Expletive deleted; the referenced person would have been Boyd.

4

With her status declared, Annie demanded all the civil effects of marriage. Specifically, she argued that all bank accounts and CDs in Burns's name were acquired during his putative marriage to her, were community property, and thus had to be returned to the succession to be divided. She proposed that the assets belonged to her (Annie) and the estate, one-half each, all subject to her usufruct.

Sharon, the co-administrator, filed a new detailed descriptive list that included six lots in Homer, worth a total of $85,000, and various bank assets totaling $658,488. She contended that James still had control (through his attorney) of three checks from the bank assets, totaling $399,678, and that this sum had to be restored to the estate.

James contended that the three checks came from accounts that were his own personal property, not Burns's, and that he should get to keep the $399,678.

Silver initially argued that she would prove that Burns was a bad-faith common husband, with the result that the two wives would get one-half each, and his heirs nothing. Later, however, she conceded that Burns was actually a good-faith common husband; hence, under the law of putative community, his heirs (the five children) would get one-half of the estate, and Silver and Annie, one-fourth each. She also decided to concur with James that the three large checks were always James's personal property. In the alternative, she argued that even if the accounts were originally owned by Burns, he validly manually donated them to James, under La. C.C. art. 1543.

## THE THIRD HEARING

At a hearing in December 2019, James and Silver stipulated that Burns was in good faith.[3] James testified, with respect to a $100,000 check from the Regions Bank account, that his dad had previously owned the account, and his (James's) signature was added in 2014; after Burns's death, he (James) closed the account and got the cashier's check made out to himself. With respect to the $149,564 check drawn from a First Guaranty Bank CD, however, James testified that this account was always his (James's), and "at some point" he added his dad's name; he offered copies of Form 1099s he received for this account in 1999, 2011, and 2015. With respect to the $150,093 check drawn from First Guaranty Bank, he testified the same, but said he had no 1099s. On cross-examination, James testified that in 1999 he was working as a lead finisher at Berry Plastics, in Homer, and "worked and saved" to amass those large CDs at First Guaranty. In addition, he maintained, he made money selling used cars with his dad, but none of that money came directly from his dad, Burns, or his mom, Silver.

Annie testified that when she and Burns got married, they were both broke, and lived in a rented shotgun house in Homer; everything he had at his death, he acquired while married to her. She denied that James ever worked together with Burns, selling cars or doing anything else. However, she admitted that she had never in her life opened a bank account, always traded in cash, and had no idea where her husband got the impressive sums on deposit at Regions and First Guaranty Banks.

---

[3] The record does not show Annie joining this stipulation.

## ACTION OF THE DISTRICT COURT

In June 2020, the district court issued reasons for judgment. Labeling the case "complicated," the court found that Burns, Silver, and Annie were all in good faith; thus, it declined to split the estate one-half each to the legal and putative wives and refuse the heirs any share, as was done in *Succession of Chavis*, 211 La. 313, 29 So. 2d 860 (1947). Instead, the court applied the putative community rule, giving one-half to the good-faith husband's heirs and one-fourth each to the legal and putative wives, as was done in *Prince v. Hopson*, 230 La. 575, 89 So. 2d 128 (1956), and *Succession of Gordon*, 461 So. 2d 357 (La. App. 2 Cir.), *writ denied*, 464 So. 2d 319 (1985).

With respect to the Regions Bank account, the court accepted that it had been in Burns's name alone until 2014, about one year before he died, when James was added; finding no evidence that Burns made a valid manual gift of this to James, the court declared it the property of the estate.

By contrast, the CDs at First Guaranty, being titled to James "or" Burns, were presumptively joint property, but James rebutted the presumption by testifying that he opened and always owned these accounts, and had some 1099s in support. The court found that even working at a "salaried job," James could, with a wife who works and no children to support, have amassed a $300,000 savings. The court declared these two CDs James's personal property and not part of the succession.

The court later rendered formal judgment, which it designated as final and appealable, and denied Annie's motion for new trial.

Annie (joined by Sharon, the co-administrator, and Estelle, her other daughter by Burns) appealed, designating four assignments of error.

7

**DISCUSSION: RECOGNITION OF LEGAL WIFE**

By her first assignment of error, Annie urges that the district court erred in assigning shares of the succession in the percentages assigned, and in recognizing that Silver, the legal wife, was entitled to anything. She first contends that the court should have found that Silver was in bad faith, as was done in *Succession of Chavis*, *supra*, where the legal wife was denied any of the common husband's succession. She submits that *Prince v. Hopson* and *Succession of Gordon*, *supra*, relied on by the trial court, are simply inapposite because they involved good-faith common husbands.

Second, she contends that Silver alleged that she was divorced from Burns, thus making a judicial confession, under La. C.C. art. 1853, which she cannot now deny. She submits that Silver is estopped from denying her divorce.

Third, she contends that despite the law of La. C.C. art. 96, *Prince v. Hopson*, *Succession of Gordon*, and *Succession of Chavis*, *supra*, the court should apply a theory of "putative divorce," whereby if the parties *think* they are divorced, and act accordingly (by marrying other people), the law should *deem* them divorced from that moment, effectively constructing two community regimes. In support, she cites a law review article, Monica Hof Wallace, *The Pitfalls of a Putative Marriage and The Call for a Putative Divorce*, 64 La. L. Rev. 71 (Fall 2003).

Finally, she contends that Silver abandoned her rights to a community with Burns by remarrying. In support, she cites cases on abandonment, *New Orleans Bank & Tr. v. City of New Orleans*, 176 La. 946, 147 So. 42 (1933); *Salim v. La. State Bd. of Educ.*, 289 So. 2d 554 (La. App. 3 Cir.), *writ ref'd*,

8

293 So. 2d 177 (1974). She submits that the law is malleable enough to adapt this concept to a community claim.

A marriage is absolutely null when contracted, *inter alia*, in violation of an impediment. La. C.C. art. 94. An undissolved prior marriage is a cause of nullity. La. C.C. art. 96; *Johnson v. Johnson*, 167 La. 861, 120 So. 479 (1929); *Burrell v. Burrell*, 154 So. 2d 103 (La. App. 1 Cir. 1963). Here, the district court found that the Arkansas divorce was based on crude forgeries and unenforceable; the Louisiana divorce petition was also based on forgeries, and never reduced to judgment. Hence, Burns was still married to Silver when he married Annie.

An absolutely null marriage nevertheless produces civil effects in favor of a party who contracted it in good faith for as long as that party remains in good faith. La. C.C. art. 96. The good faith required for putative spouse status is defined as an honest and reasonable belief that the marriage was valid and that no legal impediment to it existed. *Funderburk v. Funderburk*, 214 La. 717, 38 So. 2d 502 (1949); *Rebouche v. Anderson*, 505 So. 2d 808 (La. App. 2 Cir.), *writ denied*, 507 So. 2d 228 (1987), and citations therein. The inquiry is essentially subjective. *Succession of Marinoni*, 183 La. 776, 164 So. 797 (1935); *Rebouche v. Anderson*, *supra*. The finding that good faith is present is a factual question that is entitled to great weight and will not be reversed unless clearly wrong. *Gathright v. Smith*, 368 So. 2d 679 (La. 1978); *Rebouche v. Anderson*, *supra*.

On close review, this record falls far short of undermining the district court's factual finding of good faith. There is no showing that Silver was in bad faith when she married Burns, in 1959, and it is improbable that *she* would have forged (and misspelled) her own signature to sue Burns for

9

divorce, not once, but twice. She admitted that she had physically separated from Burns in 1966, and testified that she believed him when he told her that he had obtained a divorce from her in Arkansas. It is unlikely that she would have then married Boyd, in early 1968, had she not sincerely and reasonably believed that the divorce was valid. This evidence provides no basis for finding bad faith.

We decline to adopt Annie's contention, based on *Succession of Chavis*, *supra*, that the legal spouse is in bad faith if she "never once raised a protest" to the putative marriage. The discussion in *Chavis* focuses solely on the bad faith of the *putative wife* and of the common husband (ultimately finding both in good faith), and offers no substantial explanation for finding the *legal wife* in bad faith. Perhaps sensing the precarity of this result, the *Chavis* court warned of the "danger in accepting the jurisprudence applicable in any particular case of this character as the *established jurisprudence* governing any other single case of this sort." *Id.* at 321, 29 So. 2d at 863.[4] With this caveat in mind, we see nothing in *Chavis* that would mandate finding Silver in bad faith.

Annie next argues a "judicial confession." A judicial confession is a declaration made by a party in a judicial proceeding; it constitutes full proof against the party who made it, is indivisible, and may be revoked only on the ground of error of fact. La. C.C. art. 1853; *C.T. Traina Inc. v. Sunshine Plaza Inc.*, 03-1003 (La. 12/3/03), 861 So. 2d 156; *Rushing v. Simpson*, 52,443 (La. App. 2 Cir. 1/16/19), 264 So. 3d 612. To constitute a judicial confession, the statement must be a party's explicit admission of an adverse

_____

[4] To our knowledge, *Chavis* is the only case in the jurisprudence to find the legal (first) wife in bad faith in contracting a marriage.

10

factual element. *Chichirillo v. Avondale Indus. Inc.*, 02-2894 (La. 11/29/05), 917 So. 2d 424; *Dean v. State Farm*, 51,243 (La. App. 2 Cir. 4/5/17), 217 So. 3d 611.

For the reasons already discussed, the district court found the divorce papers were fraudulent. Since the allegations there were not made by Silver, they cannot constitute her judicial confession. Moreover, in this succession, Silver has consistently alleged that she was *not* lawfully divorced from Burns. She made no admission of an adverse factual element. We find no judicial confession.

With the finding that all three spouses were in good faith, the issue becomes the proper distribution of the succession. In situations of putative marriage, Louisiana courts applying Art. 96 have long divided the husband's succession equally between the legal and putative wives, if they are in good faith. *Patton v. Cities of Philadelphia & New Orleans*, 1 La. Ann. 98 (1846); *Succession of Fields*, 222 La. 310, 62 So. 2d 495 (1952); *Succession of Choyce*, 183 So. 2d 457 (La. App. 2 Cir.), *writ ref'd*, 249 La. 64, 184 So. 2d 735 (1966). However, in situations where the common husband is also found to be in good faith, courts divide the husband's succession one-half to the husband's heirs, and one-fourth to each wife. *Prince v. Hopson*, *supra*; *Succession of Gordon*, *supra*; *Succession of Jones*, 08-1088 (La. App. 3 Cir. 3/4/09), 6 So. 3d 331. The district court applied this formula, and we perceive no legal or manifest error.

Annie strongly argues that we should apply the concept of "putative divorce," whereby if the parties think they are divorced, and act accordingly (by entering later marriages), then the law should deem them divorced, from that time, effectively constructing two communities. In support, she cites

11

Professor Wallace's law review article, *The Pitfalls of a Putative Marriage and The Call for a Putative Divorce*, *supra*, and stresses the inequity of giving the legal wife an equal share of the putative community, to which she never contributed anything. This court is aware of the occasional, yet vocal, scholarship that has criticized *Prince v. Hopson* and its progeny.[5] However, until the legislature amends Art. 96 or the Supreme Court overrules *Prince*, we can find no legal error in applying the settled jurisprudence.

Finally, Annie contends that Silver "abandoned" her right to claim a community with Burns by remarrying. In support, she cites *New Orleans Bank & Tr. v. City of New Orleans*, *supra*, which found that a taxpayer may lose an exemption when he abandons the tax-exempt purpose of the property, and *Salim v. State Bd. of Educ.*, *supra*, which found that a tenant may (but did not, on the facts presented) abandon a lease, such that rent payments can be accelerated.

The action for partition of things owned in indivision is imprescriptible. La. C.C. art. 817. This applies to claims for division of community property. *LeBlanc v. Elam*, 18-0552 (La. App. 1 Cir. 11/2/18), 266 So. 3d 935; *Granger v. Granger*, 06-1615 (La. App. 3 Cir. 9/26/07), 967 So. 2d 540, *writ denied*, 07-2436 (La. 2/15/08), 976 So. 2d 181. Silver's claim has not prescribed. Conceivably, a spouse may renounce the right to claim a community share, *La. Bank & Tr. Co. v. Pernici*, 372 So. 2d 788 (La. App. 2 Cir. 1979), but any act of renunciation must be "clear, direct,

---

[5] See, e.g., Robert A. Pascal, *Putative Marriage and Community Property*, 17 La. L. Rev. 303 (1957); Fred R. Godwin, *Community Property – Distribution of Property Acquired During Existence of a Putative Marriage*, 17 La. L. Rev. 489 (1957); Casey E. Faucon, *"Living Separate and Apart": Solving the Problem of Putative Community Property in La.*, 85 Tul. L. Rev. 771 (Feb. 2011); Monica Hof Wallace, *A Primer on Marriage in La.*, 64 Loyola L. Rev. 557 (Fall 2018), 601.

and absolute," *Geiger v. State*, 01-2206 (La. 4/12/02), 815 So. 2d 80; *Huckabee v. Sunshine Homes*, 26,294 (La. App. 2 Cir. 12/7/94), 647 So. 2d 409. Nothing in this record reaches the level necessary to prove a renunciation. Finally, an action is deemed abandoned if the parties fail to take any step in its prosecution or defense in the trial court for a period of three years. La. C.C.P. art. 561 A; *Williams v. Montgomery*, 20-01120 (La. 5/13/21), 320 So. 3d 1036. This record shows no abandonment.

The first assignment of error lacks merit.

### INDIVIDUAL OWNERSHIP INTERESTS; USUFRUCT

By her second assignment of error, Annie urges the court erred in failing to specifically recognize the individual ownership interests of Annie in and to the assets of the putative community. In a very brief argument, she submits that "the partition of the estate applies only to the Decedent's one-half interest in the putative community," and that the judgment should specify this. By her third assignment, she urges the court erred in failing to recognize the usufruct due to Annie, flowing from her rights under La. C.C. arts. 96 and 890. She submits that the judgment should be amended to reflect this.

Silver and James both concede in brief that the children's shares should be subject to a usufruct.

The judgment recites that "the assets of the Decedent constitute assets of the community and the [putative] community," and are to be divided 25% to Annie, 25% to Silver, and 50% to Burns's five children, in equal proportions. For the reasons already discussed, this is a correct description of the estate and allocation of its disposition. The second assignment lacks merit.

13

If the deceased spouse is survived by descendants, the surviving spouse shall have a usufruct over the decedent's share of the community property to the extent that the decedent has not disposed of it by testament. La. C.C. art. 890. Although the jurisprudence has not explicitly addressed dual usufruct in the event of a putative marriage, the general rule is that *all civil effects* flow from a putative marriage. *King v. Cancienne*, 316 So. 2d 366 (La. 1975); *Succession of Gordon*, *supra*. Commentators have suggested that usufruct should result from a putative marriage. Kathryn Venturatos Lorio, Successions & Donations, 2 ed. (2009), 10 La. Civ. L. Treatise, § 2:16 C; Ryland Percy, Putative Marriages: What Are "Civil Effects"?, 36 La. L. Rev. 704 (1976). The problem, one of these notes, is the "possibility of the 890 usufruct extending over all descendants, even those who are not issue of the marriage between the decedent and the surviving spouse." Lorio, *supra*. In the absence of statutory and jurisprudential guidance, the equitable solution is to give the legal spouse usufruct over the estate inherited by her children with the decedent, and the putative spouse usufruct over that inherited by her children with the decedent.

We therefore amend the judgment to state that the undivided one-tenth interests going to James Burns, Willie Burns, and Tommy Burns are subject to the usufruct of Silver Burns, and the undivided one-tenth interests going to Sharon Burns Woods and Estelle Burns Green are subject to the usufruct of Annie Burns.

## CERTIFICATES OF DEPOSIT

By her fourth assignment of error, Annie urges the court erred in recognizing James as the owner of two certificates of deposit based on only

14

his self-serving testimony.  She cites no statutes or cases, but argues only manifest error: "The fact of saving that kind of money [$300,000] over the years is virtually impossible."  She submits that the CDs should be restored to the succession.

Ownership of the same thing by two or more persons is ownership in indivision.  In the absence of other provisions of law or juridical act, the shares of all co-owners are presumed to be equal.  La. C.C. art. 797.  There is a presumption that a joint bank account in the names of two parties is owned one-half by each.  *Succession of Hodge*, 424 So. 2d 363 (La. App. 2 Cir. 1982); *Sylvester v. Fontenot*, 10-1115 (La. App. 3 Cir. 3/9/11), 58 So. 3d 675.  This presumption may be rebutted by appropriate evidence.  *Id*.  An oral agreement over $500 must be proved by at least one credible witness and other corroborating circumstances.  La. C.C. art. 1846; *Suire v. Lafayette City-Parish Consol. Gov't*, 04-1459 (La. 4/12/05), 907 So. 2d 37; *Dortch v. Rollins*, 50,170 (La. App. 2 Cir. 12/9/15), 181 So. 3d 911.  Bank statements may constitute such evidence to prove the ownership of a joint account.  *Kitchen v. Guarisco*, 01-1016 (La. App. 4 Cir. 2/20/02), 811 So. 3d 112.

The First Guaranty Bank CD ending in ***505 was titled to "Mr. James E. Burns or Mr. W. C. Burns"; the one ending in ****198 was titled to "Mr. James E. Burns or W. C. Burns"; thus, they were presumptively owned by son and father one-half each.  *Succession of Hodge*, *supra*; *Sylvester v. Fontenot*, *supra*.  Distinguishing these from the Regions bank account, which was originally Burns's personal account until Burns added his son's name, James testified that the First Guaranty accounts were originally his (James's) personal accounts, to which he added his father's name.  On cross-examination, James testified that he and his father were

15

"co-owners in selling cars," and "I wanted my dad to have ownership if something happened to me." In support, he offered 1099s issued by First Guaranty to James *alone*, for the years 2015, 2011, and 1999; the 2015 and 2011 forms listed both accounts, ***505 and ****198.[6]

Annie admitted that she had never owned a bank account and did not know how her husband amassed the money in his; she never asked. She testified that Burns always sold cars and mowed lawns; she helped him with the lawn business but James did not.

The evidence is sufficient to rebut the presumption of joint ownership and support the finding that these CDs were James's personal property. The ways and means of the parties are not immediately apparent from the record, but the district court reasonably theorized that working as a lead finisher at Berry Plastics, selling cars on the side, having a wife who works and no children, and living frugally, James could have saved the money in these CDs. We perceive no abuse of discretion. The fourth assignment of error lacks merit.

## CONCLUSION

For the reasons expressed, the third paragraph of the judgment is amended to read:

FURTHER ORDERED, ADJUDGED, AND DECREED that the assets of Decedent constitute assets of the community and the putative community, and therefore are to be split in the following percentages:
25% to Annie Lee Bradley Burns;
25% to Silver Burns;
10% to James Burns, subject to the usufruct of Silver Burns;
10% to Willie Burns, subject to the usufruct of Silver Burns;
10% to Tommy Burns, subject to the usufruct of Silver Burns;

---

[6] James testified that the 1099s covered only the ***505 account, but the forms included in the record, as Exhibit JB-7, clearly refer to both accounts.

10% to Estelle Burns Green, subject to the usufruct of Annie Burns; and

10% to Sharon Burns Woods, subject to the usufruct of Annie Burns.

In all other respects, the judgment is affirmed.  Appellate costs are to be paid 50% by Annie Burns and 50% by Silver Burns.

**AMENDED AND AFFIRMED**.